USCA1 Opinion

 

 United States Court of Appeals United States Court of Appeals For the First Circuit For the First Circuit ____________________ No. 92-1233 UNITED STATES, Appellee, v. ALFONSO MENA-ROBLES, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Jaime Pieras, Jr., U.S. District Judge] ___________________ _____________________ No. 92-1299 UNITED STATES, Appellee, v. MIGUEL TORRES-RIVERA, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Jaime Pieras, Jr., U.S. District Judge] ___________________ ____________________ Before Torruella and Stahl, Circuit Judges and ______________ Burns, * District Judge. ______________ ____________________ Olga M. Shepard for appellant Mena-Robles. _______________ Julio C. Codias for appellant Torres-Rivera. _______________ Jose A. Quiles-Espinosa, Senior Litigation Counsel, with whom _________________________ Daniel F. Lopez-Romo, United States Attorney and Edwin O. Vazquez, _____________________ _________________ Assistant United States Attorney, were on brief for appellant. ____________________ September 28, 1993 ____________________ _____________________ *Of the District of Oregon, sitting by designation STAHL, Circuit Judge. After a jury convicted ______________ appellants Miguel Torres Rivera ("Torres Rivera") and Alfonso Mena Robles ("Mena Robles") of conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. 846, they were sentenced to terms of imprisonment of 200 months and 170 months, respectively. On appeal, both defendants claim that the district court erroneously denied their motions for acquittal made under Fed. R. Crim. P. 29, and that their sentences contravened the Sentencing Guidelines. Finding no reversible error, we affirm the convictions and sentences. I. I. __ Factual Background Factual Background __________________ We recount the relevant evidence in the light most favorable to the prosecution. United States v. Alvarez, 987 _____________ _______ F.2d 77, 79 (1st Cir. 1993), petition for cert. filed,  ________ ___ _____ _____ ___ U.S.L.W. (U.S. June 9, 1993) (No. 92-9080). The arrest ____ and indictment of appellants and their 11 original co- defendants was the culmination of a reverse sting operation conducted by the Puerto Rico Department of Justice ("PRDOJ") and the United States Drug Enforcement Administration ("DEA"). The law enforcement agents posed as large-scale cocaine dealers. Their goal was to apprehend genuine drug traffickers by arranging a "sale" of a sizable quantity of cocaine. Toward that end, PRDOJ Agent Eric Munoz ("Munoz"), -2- 2 posing as a cocaine supplier, held several meetings with potential purchasers interested in setting up a deal. On March 22, 1990, Munoz met with Carlos Kortwright Perez ("Carlos Kortwright"), his wife, Damaris Camacho Valcarcel ("Damaris Camacho"), his mother, Frances Perez Corujo ("Frances Perez"), and Samuel Solis Sierra, and began negotiations for Kortwright's purchase of 50 kilograms of cocaine at a price of $16,000 per kilogram. Further negotiations took place on April 1, 1990, at which time an agreement was reached to consummate the deal in mid-May. After several phone conversations, Munoz met on April 25, 1990, with Carlos Kortwright, Damaris Camacho, and her brother, Miguel Camacho Valcarcel ("Miguel Camacho"). Munoz told Miguel Camacho that the deal could take place in approximately two weeks. After further telephone conversations between Munoz and the potential buyers, Munoz met again with Carlos Kortwright and Damaris Camacho on May 6, 1990. They discussed more details of the deal, with Munoz reporting that the ship carrying the cocaine to Puerto Rico was already at sea. On May 10, 1990, Damaris Camacho called Munoz and informed him that the money needed for the drug sale had been gathered. For closing the deal, two rooms at the Cerromar Hotel in Dorado Beach, Puerto Rico, had been rented. The plan was for the sale to take place in one room, while police -3- 3 would undertake surveillance from the other. After preparing the rooms, Munoz phoned Carlos Kortwright and told him he was ready. Two hours later, Carlos Kortwright and Frances Perez arrived at the hotel. After hours of phone calls between and among Munoz, Carlos Kortwright, his brother, Jose, and Samuel Solis Sierra, it became apparent that the money was not, in fact, ready. Finally, the deal was called off, with Munoz telling Carlos Kortwright that the cocaine had been sold to other, more ready, purchasers. He did, however, report that a new supply of cocaine might soon be available. After several telephone contacts, an agreement was arranged to sell Carlos Kortwright 75 kilograms of cocaine at $14,500 each. The transaction was set for May 24, 1990. Again, two hotel rooms were rented, this time at the Condado Plaza Hotel in Condado, Puerto Rico. After Munoz and his undercover partner, Lt. Ayala, phoned Carlos Kortwright and Frances Perez, they all met at the hotel, along with Miguel Camacho, Samuel Solis Sierra and Rolando Solis Sierra. Miguel Camacho accompanied Munoz to one of the hotel rooms to sample some of the cocaine. All the buyers except Frances Perez then left the hotel, presumably to return later to consummate the deal. Again, however, the sale fell through, as Carlos Kortwright reported to Munoz that he was having problems with his "money man." Carlos Kortwright then told Munoz that he was "going -4- 4 to take over everything [and] be in charge," and that Munoz should call him the next day, Friday, May 25, 1990. Meanwhile, the law enforcement officials had decided to let the weekend elapse before resuming negotiations. On May 25, 1990, Munoz told Frances Perez that the deal was on hold. On May 28, 1990, Munoz again contacted Carlos Kortwright and Frances Perez to resume negotiations. Later that day, the three, along with Lt. Ayala and DEA Special Agent Miranda met at a Pizza Hut in Condado. They agreed to carry out the cocaine sale on May 31, 1990, at a police-owned beach house at Vega Baja, Puerto Rico. Prior to the meeting at the beach house, the plans called for a meeting at La Terraza restaurant in Dorado, Puerto Rico, where Munoz would be able to see the buyers' money. It was agreed that Munoz would then phone the beach house, and they would all drive there, caravan style. In reality, Munoz's picking up the telephone was to be the signal for other officers to move in and make arrests. On May 31, 1990, at approximately 2:00 p.m., Carlos Kortwright phoned Munoz, and the two agreed to meet at La Terraza at 3:30 that afternoon. Shortly after Munoz and Ayala seated themselves in the empty restaurant, several cars arrived simultaneously, including a brown Buick owned by appellant Mena Robles. In total, Munoz testified to seeing about a dozen people arrive. Of those people, Carlos -5- 5 Kortwright, Alberto Morales Colberg and Jose Francisco Casiano joined Munoz and Ayala at one table. Appellants sat across from each other at the next table, two to three feet from the others, facing in the direction of Munoz's table. The other dozen or so tables in the restaurant were unoccupied. After everyone gathered in the restaurant, Munoz asked Carlos Kortwright about the two men (the appellants) seated at the adjacent table. Munoz testified that Kortwright told him that "these people are here to protect the money and the money is outside." Munoz then offered to buy drinks for the entire group, including appellants, but Colberg precluded any acceptance of the offer by insisting on proceeding with the deal. Soon after, a waiter brought Munoz and Ayala drinks they had ordered before the others' arrival. At that point, Ayala repeated Munoz's drink offer. This time, Casiano, seated between Munoz and Ayala, interceded, giving his approval to Ayala's offer. Appellant Mena Robles ordered a beer. At about the same time, co-defendant Rafael Montanez Ortiz, who had remained outside, entered the restaurant and shouted something in the direction of the group. Carlos Kortwright left the table and spoke briefly with Montanez Ortiz. When he returned, Colberg again tried to get the deal going. He asked Munoz whether the 75 kilos of cocaine were available. When Munoz replied affirmatively -6- 6 and asked Colberg whether he was ready to buy, Colberg and Carlos Kortwright went to the parking lot, retrieved a notebook and calculator from one of the vehicles, and sat together at an empty table in the restaurant, away from the others. After a short time, they returned to their original seats, whereupon Colberg told Munoz that he was ready to buy 15 kilos immediately, and the other 60 kilos later that evening. Munoz balked, first telling Colberg that he had no place to keep the unsold 60 kilos that Carlos Kortwright had originally agreed to buy, and then reminding Colberg that he, Munoz, had yet to see any of the buyers' money. Colberg and Carlos Kortwright then escorted Munoz to a blue Volvo in the parking lot. Three men were near the car, one of whom, Hector Santana Olmo, was leaning against the trunk as Munoz arrived. Munoz was unable to identify the other two men with Santana Olmo. Upon opening the trunk, Santana Olmo showed Munoz two bags of money. The first contained packs of five, ten, and twenty dollar bills, which, Munoz told Santana Olmo, would be insufficient to complete the deal. The second bag, however, a large plastic trash bag, contained packs of fifty and one hundred dollar bills. Santana Olmo told Munoz that there was a total of $500,000 in the two bags. Satisfied by the buyers' showing, Munoz told them that he would alert his confederates. On his way to the telephone, Munoz stopped to talk to Ayala, who was then alone -7- 7 in the restaurant.1 He apprised Ayala of what had transpired outside. Munoz proceeded to the telephone. When he picked up the receiver, however, the expected law enforcement help did not materialize. He phoned headquarters and was informed that many of the officers were caught in traffic. Munoz stalled on the phone, because he had told the buyers that the drugs would arrive five minutes after he placed the call. While speaking with headquarters, Munoz told an officer there to inform the arriving officers that the money was in a blue Volvo. While still on the phone, Munoz was approached by Colberg and Carlos Kortwright. He told them he was having last-minute difficulty with his supplier. When Munoz finally got off the phone, the three men started walking back toward the restaurant, stopping in the parking lot, behind the brown Buick, which was then occupied by three people with the right-front door open. The Buick was still parked next to Munoz's car. Munoz then entered the restaurant, where Samuel Solis Sierra was speaking with Ayala. As Munoz approached them, other law enforcement agents arrived. Munoz and Ayala arrested Solis Sierra. Munoz then went outside with the other officers. Santana Olmo, the two unidentified men with him, and the blue Volvo in which Munoz had seen the money had  ____________________ 1. According to Munoz, appellants had remained at the adjacent table throughout the negotiations. The record is silent as to when they left it. -8- 8 already departed. The men inside the brown Buick turned out to be appellants and Rafael Montanez Ortiz. Mena Robles, to whom the car was registered, was in the driver's seat; Torres Rivera was in the back; Montanez Ortiz was in the front passenger seat, adjacent to the open door. A Magnum revolver was found on the ground about five feet from the open car door. Bullets compatible with the gun were found on Montanez Ortiz's person. All three men were arrested. In total, nine people were arrested at the restaurant; the remaining co- defendants were apprehended later. On June 27, 1990, 13 people were named in a six- count indictment. Count I charged all 13 with participating in a conspiracy to possess with intent to distribute cocaine. Appellants were charged only in Count I. Except for appellants, all defendants pled guilty prior to trial. Several pled to one count of the indictment, while others pled to new informations in exchange for having the indictment dismissed. II. II. ___ DISCUSSION DISCUSSION __________ A. The Rule 29 Motions2 A. The Rule 29 Motions _______________________  ____________________ 2. Pursuant to Fed. R. Crim P. 29, "The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal . . . if the evidence is insufficient to sustain a conviction . . . ." -9- 9 Appellants claim that the district court erred in denying their respective Rule 29 motions for acquittal.3 Our task is to review the record to determine whether the evidence and reasonable inferences therefrom, taken as a whole and in the light most favorable to the prosecution, would allow a rational jury to determine beyond a reasonable doubt that the defendants were guilty as charged. Alvarez, _______ 987 F.2d at 83. A conviction may be premised in whole or part on circumstantial evidence. Id. In addition, "juries ___ are not required to examine the evidence in isolation, for `individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts.'" United States v. Ortiz, 966 F.2d 707, _____________ _____ 711 (1st Cir. 1992), cert. denied, 113 S. Ct. 1005 (1993) _____ ______ (quoting Bourjaily v. United States, 483 U.S. 171, 179-80 _________ _____________ (1987)). Finally, it is not our function to weigh evidence or make credibility determinations. Id. Instead, it is the ___ jury's responsibility to make credibility judgments. Thus, the jury is empowered to accept or reject, in whole or in part, any testimony. Alvarez, 987 F.2d at 83. _______ Here, appellants were charged with and convicted of conspiracy. "The `essence' of a conspiracy is an agreement _________  ____________________ 3. Although both appellants appeal the denial of their Rule 29 motions, they assert different grounds. We therefore address them individually. -10- 10 to commit a crime." United States v. Moran, 984 F.2d 1299, ______________ _____ 1300 (1st Cir. 1993) (quoting Iannelli v. United States, 420 ________ _____________ U.S. 770, 777 (1975) (emphasis in original)). To convict a defendant of conspiracy, the government must prove, beyond a reasonable doubt, that the defendant intended to agree and to commit the substantive offense that was the object of the agreement. United States v. Cruz, 981 F.2d 613, 616 (1st ______________ ____ Cir. 1992). The agreement may be express or tacit, and may be proven by direct or circumstantial evidence. Id. (citing ___ United States v. Rivera-Santiago, 872 F.2d 1073, 1079 (1st _____________ _______________ Cir.), cert. denied, 492 U.S. 910 (1989)). "However, the _____ ______ government need not establish that the defendants knew or agreed upon every detail of the conspiracy. All that is required is to show the essential nature of the plan and their connections with it." United States v. O'Campo, 973 _____________ _______ F.2d 1015, 1019 (1st Cir. 1992) (citation and internal quotations omitted). 1. Mena Robles 1. Mena Robles ______________ Appellant Mena Robles argues that the evidence fails to show the existence of an agreement between himself and the other conspirators. We disagree. It is true, as Mena Robles argues, that there is no evidence tending to indicate that he played a role in arranging the transaction. Mena Robles also correctly asserts that his actions in the restaurant on May 31, 1990, are consistent with the behavior -11- 11 of an innocent bystander; that is, there is nothing inherently inculpatory about sitting at a particular table, near other people, and accepting a beer when offered. Those facts are not dispositive, however. Even if Mena Robles did not actively participate until the final negotiation, he is not necessarily absolved from being implicated in the conspiracy because the government is not required to prove that he took part in all aspects of the conspiracy. See ___ Cruz, 981 F.2d at 617. As for Mena Robles's "innocent ____ bystander" argument, we note that "jurors can be assumed to know that criminals rarely welcome innocent persons as witnesses to serious crimes and rarely seek to perpetrate felonies before larger-than-necessary audiences." Ortiz, 966 _____ F.2d at 712. In addition, "`there are circumstances where presence itself implies participation--as where a 250-pound bruiser stands silently by during an extortion attempt, or a companion stands by during a robbery, ready to sound a warning or give other aid if required.'" Ortiz, 966 F.2d at _____ 712 (quoting United States v. Martinez, 479 F.2d 824, 829 ______________ ________ (1st Cir. 1973)). Thus, the jury could have inferred, for example, that Montanez Ortiz's decision to shout to Carlos Kortwright, within earshot of the negotiators, was done with the knowledge that appellants were not "innocent bystanders," but instead were participants in the scheme. Based on our -12- 12 reading of the record, a reasonable jury could also conclude that appellants: arrived at the restaurant simultaneously with the other putative conspirators; parked their car near to those of the others; sat at an adjacent table, only a few feet from the main negotiators, despite the fact that the rest of the restaurant was empty; faced toward the negotiators for the entire time they were in the restaurant; first declined, and then accepted, the officers' drink offers, apparently in response to instructions from codefendants Colberg and Casiano; were identified by codefendant Carlos Kortwright as being with the group to "protect the money;"4 and were arrested in a car with codefendant Montanez Ortiz. While these factual conclusions are not the only ones the jury could have reached, we find them eminently reasonable. See e.g., United States v. Nueva, 979 F.2d 880, ___ ____ _____________ _____ 883 (1st Cir. 1992), cert. denied, 113 S. Ct. 1615 (1993) _____ ______ ("prosecution need not exclude every reasonable hypothesis of innocence, so long as the total evidence permits a conclusion of guilty beyond a reasonable doubt."). Accordingly, we find  ____________________ 4. Mena Robles urges us, for a variety of reasons, to reject Munoz's testimony regarding Carlos Kortwright's identification. All of the suggested bases for rejection, however, depend on an evaluation of Carlos Kortwright's credibility, which, as we have already noted, is the province of the jury. -13- 13 the evidence sufficient to support Mena Robles's conspiracy conviction. 2. Torres Rivera 2. Torres Rivera ________________ As his first enumerated issue, appellant Torres Rivera asks "Whether there was sufficient evidence to find this Appellant guilty of the charged conspiracy and whether the Appellant received ineffective assistance of counsel." The ensuing section of the brief, however, is devoted almost entirely to a claim of prejudicial variance between the indictment, which alleged a single conspiracy, and the evidence, which, according to Torres Rivera, revealed "several" conspiracies. We will address these claims individually. a. Sufficiency of the Evidence a. Sufficiency of the Evidence _______________________________ Torres Rivera essentially argues, as did Mena Robles, that he was an innocent bystander to the negotiations, rather than a participant. For the reasons set forth in our disposition of Mena Robles's similar claim, see ___ supra sec. II.A.1, we find Torres Rivera's argument _____ meritless. b. Prejudicial Variance b. Prejudicial Variance ________________________ -14- 14 Torres Rivera's variance argument is no more availing.5 Essentially, Torres Rivera contends that the "first" conspiracy ended on May 29, 1990, when the cocaine deal apparently collapsed because of problems with Carlos Kortwright's "money man," Miguel Camacho. Appellant argues that the "second" conspiracy was formed thereafter, when Carlos Kortwright teamed with Morales Colberg, Casiano, Santana Olmo and Montanez Ortiz. Appellant claims that the evidence introduced relative to the "first" conspiracy caused him substantial prejudice, as he could conceivably have been part of the "second" conspiracy only. Whether there is a single conspiracy, multiple conspiracies, or no conspiracy at all is ordinarily a factual matter for the jury to determine. United States v. David, ______________ _____ 940 F.2d 722, 732 (1st Cir. 1991), cert. denied, 112 S. Ct. _____ ______ 2301 (1992). Where, as here, there is no challenge to the jury instructions, we review the jury's conclusion as to whether one or more conspiracies existed only for evidentiary sufficiency. Id. To conclude that there was a single ___ conspiracy, the jury need not be presented with evidence showing that each coconspirator knew every detail of the  ____________________ 5. At oral argument, the government suggested that Torres Rivera failed to preserve this argument because he did not raise it below. Upon review of the record, it appears that appellant put forth the variance argument in an unsuccessful pretrial motion for severance. We will therefore assume, for purposes of this appeal, that the pretrial motion preserved the issue. -15- 15 conspiracy, or even that each conspirator knew every other coconspirator. United States v. Garcia-Rosa, 876 F.2d 209, _____________ ___________ 223 (1st Cir. 1989), cert. denied, 493 U.S. 1030, vacated on _____ ______ _______ __ other grounds sub nom. Rivera-Feliciano v. United States, 498 _____ _______ ___ ____ ________________ _____________ U.S. 954 (1990). Indeed, a single conspiracy may exist where there has been no direct contact among some of the participants. United States v. Giry, 818 F.2d 120, 127 (1st _____________ ____ Cir.), cert. denied, 484 U.S. 855 (1987). Moreover, "[t]he _____ ______ fact that every defendant did not participate in every transaction necessary to fulfill the aim of their agreement does not transform a continuing plan into multiple conspiracies." United States v. Drougas, 748 F.2d 8, 17 (1st _____________ _______ Cir. 1984). Instead, a jury may find a single conspiracy if the evidence sufficiently demonstrates "that all of the alleged coconspirators directed their efforts towards the accomplishment of a common goal or overall plan." Id.  ___ In this case, the "common goal" was the purchase of a large amount of cocaine. Two unsuccessful attempts were made to the consummate the sale, before the final attempt at the restaurant on May 31, 1990. In each attempt, Carlos Kortwright, Jose Kortwright, Samuel Solis Sierra and Rolando Solis Sierra appeared to be the main actors. The supporting cast, however, changed somewhat prior to the final attempt, as Colberg, Casiano, Santana-Olmo, Montanez Ortiz and appellants replaced Damaris Camacho, Miguel Camacho and -16- 16 Frances Perez. In our view, the evidence supports a conclusion that these events constituted a single conspiracy to purchase cocaine. As we stated above, it is of no moment that all the conspirators did not participate in all attempts to further the plan spearheaded by the main players. See, ___ e.g., United States v. Aponte-Suarez, 905 F.2d 483, 488 (1st ____ _____________ _____________ Cir.), cert. denied, 498 U.S. 990 (1990) (finding sufficient _____ ______ evidence to support single conspiracy where appellants were involved in only one of three attempts by a major dealer to purchase cocaine). Therefore, appellant Torres Rivera's variance argument must fail.6 c. Ineffective Assistance of Counsel c. Ineffective Assistance of Counsel _____________________________________ Torres Rivera's claim of constitutionally defective counsel rises and falls with his variance claim. He argues that trial counsel was ineffective because of his failure to object to evidence that Torres Rivera alleges was relevant only to the "first" conspiracy, and that he was prejudiced by the introduction of such evidence. It is well settled that we measure the quality of trial counsel's performance under the two-part standard set by Strickland v. Washington, 466 U.S. 668 (1984). Pursuant __________ __________ to Strickland, a defendant must show that counsel performed __________  ____________________ 6. Because the jury could reasonably have found a single conspiracy, we do not address whether Torres Rivera was prejudiced by the alleged "variance." -17- 17 unreasonably and that prejudice resulted therefrom. Id.; see ___ ___ also United States v. Walters, 904 F.2d 765 (1st Cir. 1990). ____ _____________ _______ As noted above, the single/multiple conspiracy argument is without merit. Moreover, according to the record, the district court rejected the same argument made by several other defendants, who, according to Torres Rivera were part of the "second conspiracy." In light of these prior rulings, counsel's failure to rehash the same failed argument cannot be considered ineffective assistance of counsel. See United States v. Andiarena, 823 F.2d 673 (1st ___ ______________ _________ Cir. 1987). Accordingly, we reject Torres Rivera's claim of ineffective assistance of counsel. B. Sentencing Issues B. Sentencing Issues ____________________ Appellants aim a barrage of arguments at their respective sentences. We address them seriatim. Torres Rivera first argues that the district court erroneously calculated his base offense level ("BOL"). Pursuant to U.S.S.G. 2D1.1(c) and 2D1.47, the BOL for a conspiracy conviction such as this depends on the quantity of contraband attributable to the defendant. The district court concluded that appellants were to be held accountable for 15  ____________________ 7. Although section 2D1.4 has since been repealed, it was part of the 1991 Guidelines Manual, applicable to this case by virtue of the fact that sentencing took place in February 1992. See, e.g., United States v. Pineda, 981 F.2d 569, 571 ___ ____ _____________ ______ n.1 (1st Cir. 1992) (appropriate guidelines are those in effect at time of sentencing). Accordingly, all guideline citations herein refer to the 1991 manual. -18- 18 kilograms of cocaine,8 and set the BOL at 34. U.S.S.G. 2D1.1(c). Torres Rivera claims that the district court's use of the 15 kilogram amount was erroneous; that he should be held responsible for less than 500 grams; and that his BOL therefore should be 24. We disagree. U.S.S.G. 1B1.3(a)(2) provides that the BOL shall be determined on the basis of "all acts or omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction." The relevant application note provides: In the case of criminal activity undertaken in concert with others, whether or not charged as a conspiracy, the conduct for which the defendant "would be otherwise accountable" also includes conduct of others in furtherance of the execution of the jointly- undertaken criminal activity that was reasonably foreseeable by the defendant. U.S.S.G. 1B1.3, comment. (n.1). The final piece of the puzzle provides that if a "defendant is convicted of an offense involving negotiation to traffic in a controlled substance, the weight under negotiation in an uncompleted  ____________________ 8. This amount, to which the government stipulated, agrees both with the quantity that Colberg told Munoz that he would be able to immediately purchase, and with the money that was shown to Munoz in the Volvo in the restaurant parking lot. According to the record, the negotiated price for the cocaine was $16,000 per kilogram; the $500,000 that Santana Olmo claimed was in the Volvo would, therefore, have been more than sufficient to make the purchase. -19- 19 distribution shall be used to calculate the applicable guideline amount." U.S.S.G. 2D1.4, comment. (n.1); see ___ also United States v. Gerante, 891 F.2d 364, 369 (1st Cir. ____ _____________ _______ 1989) (affirming estimation of drug quantity based on amount of money found in defendant's possession). The thrust of Torres Rivera's BOL argument is that he had no ability to produce any money to purchase cocaine. This argument is rooted in the following statement, contained in Application Note 1 to section 2D1.4: However, where the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount, the court shall exclude from the guideline calculation the amount that it finds the defendant did not intend to produce and was not reasonably capable of producing. In referring to this statement, however, Torres Rivera has ignored the very next sentence in the same Note: "If the defendant is convicted of conspiracy, see Application Note 1 ___ to 1B1.3 (Relevant Conduct)." And, as we noted above, that section calls for consideration of the foreseeable acts of coconspirators in determining the BOL. Thus, as the district court correctly concluded, Torres Rivera's personal financial ________ ability is inapposite to the matter at hand. The remainder of Torres Rivera's BOL-related argument is directed at the fact that much of the negotiating in this case took place prior to his active involvement. Therefore, he argues, those negotiations could not have been -20- 20 "reasonably foreseeable" to him, and he should not be held responsible for any drugs involved with earlier stages of the case. This argument, however, overlooks the events that took place on May 31, 1990, when he, as a guard, took part in the final negotiations. Thus, he is in fact being held responsible for drugs negotiated while he was an active participant in the conspiracy. Finally, a recent decision of this court further undermines Torres Rivera's theory. In United States v. De La _____________ _____ Cruz, No. 92-1279, (1st Cir. June 24, 1993), we rejected a ____ foreseeability argument made by a defendant whose only role in a drug conspiracy had been as a driver. At sentencing, and on appeal, the defendant claimed that he had no knowledge of the amount of cocaine he was transporting. We first noted that the defendant must have known that he was part of a large-scale deal due to the number of people and vehicles present at the warehouse where the drugs were stored. Id., ___ slip op. at 17-18. We then stated: ____ ___ A defendant who conspires to transport for distribution a large quantity of drugs, but happens not to know the precise amount, pretty much takes his chances that the amount actually involved will be quite large. On De La Cruz' theory, no amount at all could properly be assigned to him if, as may well be the case, he never had a specific quantity in mind. The danger actually posed by the conspiracy was the distribution of 240 kilograms, De La Cruz knew that a large quantity was involved, and--absent -21- 21 special circumstances--we think that is enough. Id. at 18. In our view, Torres Rivera's role is analogous to ___ that of De La Cruz. Given his presence at the final negotiations and his role as a guard for the "money man," his general knowledge of the size of the cocaine deal is readily inferable. And, like De La Cruz, Torres Rivera "took his chances" as to the specific quantity. In light of the foregoing, we can find no clear error in either the district court's determination of the quantity of cocaine attributable to appellant Torres Rivera, or its resulting use of a BOL of 34. See, e.g., United ___ ____ ______ States v. Figueroa, 976 F.2d 1446, 1461 (1st Cir. 1992), ______ ________ cert. denied, 113 S. Ct. 1346 (1993) (applying clear error _____ ______ standard to appellate review of drug quantity attributed to conspiracy defendant). Torres Rivera next argues that his sentence was disproportionately severe when compared with the sentences of similarly situated codefendants. To support this claim, he dwells on the fact that his 200 month prison sentence was greater than those received by all other coconspirators, including those referred to in the indictment as organizers, leaders, managers and negotiators. We reject this sentencing disparity claim. First, our review of the record indicates that Torres Rivera was treated similarly to those codefendants who pled guilty to the same conspiracy count of -22- 22 which he was convicted.9 All began with a BOL based on a 15 kilogram conspiracy. While some sentences varied, much of that has to do with the fact that Torres Rivera was in a Criminal History Category III, and that he and Mena Robles were the only recipients of a firearm enhancement. Moreover, despite Torres Rivera's claim to the contrary, the record reveals no downward sentencing departures having been granted to any codefendant. And, as a final matter, we have firmly held that "a perceived need to equalize sentencing outcomes for similarly situated codefendants, without more, will not permit a departure from a properly calculated guideline sentencing range." United States v. Wogan, 938 F.2d 1446, _____________ _____ 1448 (1st Cir.), cert. denied, 112 S. Ct. 441 (1991). _____ ______ Accordingly, we reject Torres Rivera's sentencing disparity argument.10 Next, both appellants challenge the district court's two-point offense-level enhancement, pursuant to  ____________________ 9. Several other coconspirators pled guilty to lesser charges contained in superseding informations in exchange for dismissal of their indictments. Those coconspirators therefore received, comparatively, the shortest sentences. We reject, however, Torres Rivera's reliance on the sentences meted out to this group as support for his disproportionality claim. See, e.g., United States v. Butt, 955 F.2d 77, 90 ___ ____ ______________ ____ (1st Cir. 1992) (where codefendants are charged and convicted of different offenses, they are not "similarly situated"). 10. We have reviewed Torres Rivera's other sentencing complaints and find them to be without merit. -23- 23 U.S.S.G. 2D1.1(b)(1),11 for possession of a firearm during the offense. This circuit calls for the firearm enhancement "whenever a codefendant's possession of a firearm in furtherance of [] joint criminal activity was reasonably foreseeable to the defendant." United States v. Bianco, 922 _____________ ______ F.2d 910, 912 (1st Cir. 1991) (citations omitted).12 In reviewing a district court's use of the firearm enhancement, we accord due deference to the application of the enhancement to the facts of the case. United States v. Sostre, 967 F.2d _____________ ______ 728, 731 (1st Cir. 1992). Factual conclusions related to sentencing need only be supported by a preponderance of the evidence and will be set aside only for clear error. Id. ___ Appellants essentially argue that the evidence is not sufficient to support the two-level adjustment. We do not agree. As noted above, coconspirator Montanez Ortiz was found in possession of five bullets compatible with the gun retrieved from just outside the car in which he and appellants were seated at the time of their arrests. From this, the court could properly infer that Montanez Ortiz had  ____________________ 11. In relevant part, section 2D1.1(b)(1) provides for a two level BOL increase "[i]f a dangerous weapon (including a firearm) was possessed during commission of the offense . . . ." 12. We note with particular emphasis the First Circuit standard because appellants rely on a host of cases from other circuits. -24- 24 the gun on his person prior to ejecting it from the car.13 Appellants assert that neither their presence in Mena Robles's car with Montanez Ortiz, nor any other record evidence, is sufficient to infer the requisite foreseeability. However, as we stated in Bianco: _______ [W]e often observe that firearms are common tools of the drug trade. Absent evidence of exceptional circumstances, we think it fairly inferable that a codefendant's possession of a dangerous weapon is foreseeable to a defendant with reason to believe that their collaborative criminal venture includes an exchange of controlled substances for a large amount of cash. Id. at 912 (citations omitted). See also Sostre, 967 F.2d at ___ ___ ____ ______ 731-32 (enhancement affirmed where only codefendant physically possessed gun, but defendant was part of "protection" team employed by drug seller); United States v. _____________ Bello-Perez, 977 F.2d 664, 673 (1st Cir. 1992) (weapon ___________ enhancement affirmed where only codefendant was in actual possession of firearm, but both defendant and codefendant served as "muscle" for drug-debt collections). Here, given the jury's supportable conclusion that appellants were involved in the drug transaction at issue, and the lack of any evidence to contradict the reasonable foreseeability of Montanez Ortiz's possession of a gun at the  ____________________ 13. Indeed, Montanez Ortiz pled guilty, in exchange for dismissal of the indictment, to an information charging him with carrying a firearm during the commission of a drug related felony in violation of 18 U.S.C. 924(c). -25- 25 scene of a large-scale cocaine deal, we can find no clear error in the district court's application of the two-level weapon enhancement.14 Next, Mena Robles contends that the gun enhancement was the product of vindictive sentencing on the part of the district judge. This assertion is based solely on the fact that only these appellants exercised their right to trial, and they alone received the sentencing enhancement, although those codefendants who pled guilty to the conspiracy charge were situated similarly with respect to the firearm at issue. We do not agree. In North Carolina v. Pearce, 395 U.S. 711 (1969), _______________ ______ the Supreme Court faced a situation where a defendant who successfully appealed his conviction was again found guilty on retrial and given a harsher sentence by the same trial judge. The Court, concerned with the possibility of a vindictive response to the exercise of a constitutional right to appeal, held that such an increased sentence must be explained in the record. Id. at 726. Later, the Court held ___  ____________________ 14. Appellants also argue that the district court failed to make the specific findings mandated by 18 U.S.C. 3553(c). See United States v. McDowell, 918 F.2d 1004, 1012 (1st Cir. ___ _____________ ________ 1990). This assertion is based primarily on the fact that the sentencing judge did not, as he said he would, issue written findings "summarizing his reasons for . . . a two level increase . . . ." While it is apparently true that no such written summary has been issued, our review of the sentencing transcript shows clearly that the district court made factual findings sufficient both to support the enhancement and to adequately frame the appeal. -26- 26 that a "presumption of vindictiveness" is triggered whenever the same judge imposes a stiffer sentence after retrial. United States v. Goodwin, 457 U.S. 368, 374 (1982). This _____________ _______ presumption may be overcome only when objective information in the record justifies the increased sentence. Id. at 372- ___ 384; Johnson v. Vose, 927 F.2d 10, 11 (1st Cir. 1991). _______ ____ We have applied the Pearce presumption to ______ situations where, as here, defendant has rejected a plea bargain in favor of a trial. See, e.g., United States v. ___ ____ _____________ Crocker, 788 F.2d 802 (1st Cir. 1986); Longval v. Meachum, _______ _______ _______ 693 F.2d 236 (1st Cir. 1982) cert. denied, 460 U.S. 1098 _____ ______ (1983). As we have pointed out, however, "not every instance of an enhanced sentence following a defendant's exercise of a legal right triggers the presumption." Vose, 927 F.2d at 11. ____ "The principle established by Pearce and its progeny is not ______ that enlarged sentences are forbidden, but only that such sentences may not be fueled by vindictiveness." Id. ___ Therefore, we have qualified the presumption, holding that "[t]he presumption [] arises only in circumstances in which there is a reasonable likelihood that the increase in sentence is the product of actual vindictiveness on the part of the sentencing authority." Id. In the absence of such ___ reasonable likelihood, the defendant bears the burden of proving actual vindictiveness. Id., citing Alabama v. Smith, ___ _______ _____ 490 U.S. 794 (1989). -27- 27 As we stated above, Mena Robles has pointed to nothing in the record to support a claim of vindictiveness, other than the fact of the gun enhancement itself. This will not suffice. In Both Longval and Crocker, the trial judges _______ _______ made mid-trial comments which "explicitly linked harsher sentences to the defendants' refusal to cut short their right to a jury trial." Vose, 927 F.2d at 12. These remarks, we ____ determined, were sufficient to establish a reasonable likelihood of vindictiveness. Id.15 Here, the record is ___ devoid of similar evidence that would trigger the Pearce ______ presumption or demonstrate actual vindictiveness. Accordingly, Mena Robles's vindictiveness argument fails.16 Appellant Torres Rivera also argues that the implementation of the gun enhancement without a finding a guilt beyond a reasonable doubt is a violation of due process. This contention has been soundly rejected, and thus we need not address it further. See United States v. Pineda, ___ _____________ ______ 981 F.2d 569, 574 (1st Cir. 1992).  ____________________ 15. In addition, we noted in Crocker and Longval that the _______ _______ trial judges' comments could be construed as retaliation for pursuing trials in cases the judges considered "unworthy of [their] time and effort." Crocker, 788 F.2d at 809. Here, _______ where the sentencing judge did not preside at trial, no such sentiment is likely. 16. Indeed we must question, but need not here decide, whether such a presumption can ever result where, as here, the sentencing judge was not the trial judge. -28- 28 As a final matter, we address Torres Rivera's claim that he should have been granted a four-point reduction in his BOL for playing only a "minimal" role in the conspiracy. The district court awarded him a two-level adjustment as a "minor" participant. See U.S.S.G. 3B1.2. We review the ___ district court's mitigating role determination for clear error. United States v. Dietz, 950 F.2d 50, 52 (1st Cir. _____________ _____ 1991). According to the relevant application notes, a "minimal" participant is a defendant who is "plainly among the least culpable of those involved in the conduct of a group." While that description may superficially fit Torres Rivera, further light is shed on the parameters of the adjustment by means of these illustrative examples: "someone who played no other role in a very large drug smuggling operation than to offload part of a single marihuana shipment, or in a case where an individual was recruited as a courier for a single smuggling transaction involving a small amount of drugs." U.S.S.G. 3B1.2, comment. (n.2). Moreover the same note indicates that the "minimal participant" adjustment will be used "infrequently." We believe the district court correctly concluded that this should not be one of those infrequencies. In his role as a guard for the money, Torres Rivera occupied a position integral to the completion of the deal. Indeed, Munoz testified that Carlos Kortwright said that such protection -29- 29 was necessary because "the money man" had "lost money" in prior transactions. In the end, we accept the following reasoning on the part of the district court: The Court finds, however, that since the amount of drugs involved was quite large and since defendant acted as a bodyguard, a role which entailed providing protection to the principal actors during their negotiations and may result in acts of violence, that it cannot in good conscience assign any such actor the label of minimal participant. Based on the foregoing, we reject Torres Rivera's claim of minimal participant status. We have reviewed appellants' other arguments, and find them without merit. Appellants' convictions and sentences are therefore affirmed. affirmed. _________ -30- 30