21 F.3d 420
 NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
UNITED STATES, Appellee,
v.
Jairo GIRALDO-PARRA, Defendant, Appellant.
 No. 93-1352
 United States Court of Appeals,
First Circuit.
 April 25, 1994
 
 Appeal from the United States District Court for the District of Puerto Rico [Hon. Hector M. Laffitte, U.S. District Judge ]
 Luis Rafael-Rivera for appellant.
 Jose A. Quiles-Espinosa, Senior Litigation Counsel, with whom Guillermo Gil, United States Attorney, was on brief for appellee.
 D. Puerto Rico
 AFFIRMED
 Before Selya, Circuit Judge, Bownes, Senior Circuit Judge, and Cyr, Circuit Judge.
 BOWNES, Senior Circuit Judge.
 
 
 1
 A jury convicted defendant-appellant Jairo Giraldo Parra of conspiracy to possess cocaine and heroin with intent to distribute, 21 U.S.C. Sec. 846; and possession of cocaine and heroin with intent to distribute, 21 U.S.C. Sec. 841(a)(1). He was also convicted under the "principals" statute, 18 U.S.C. Sec. 2. Defendant was sentenced to 151 months of incarceration.
 
 
 2
 There are two issues on appeal: (1) whether the district court erroneously denied defendant's Rule 29 motion for acquittal and (2) whether the district court incorrectly applied the Sentencing Guidelines in determining defendant's sentence.
 
 I.
 THE EVIDENCE
 
 3
 We review the relevant evidence and draw reasonable inferences therefrom, in the light most favorable to the government. United States v. Mena-Robles, 4 F.3d 1026, 1029 (1st Cir. 1993); United States v. Hernandez, 995 F.2d 307, 311 (1st Cir. 1993). Defendant's arrest and indictment followed a Drug Enforcement Administration (DEA) sponsored undercover operation spanning the last five months of 1991. Five others were also caught in the undercover net and were indicted along with defendant. Although defendant was the sole defendant at trial, the co-conspirators' names appear in the record and are essential to understand the evidence: Oscar Gonzalez Lopez; Daniel Alberto Atilio Adinolfi; Victor Rodriguez Alvarez; John Doe, a/k/a Edgardo Rodriguez; and Jorge Omar Lopez Almeida. As is usual in a drug undercover operation, many of the conversations, telephone and face-to-face, were recorded.
 
 
 4
 Defendant was the owner-operator of a restaurant called "Mi Pequena Colombia" located on Domenech Avenue in Hato Rey. The undercover operation started on August 21, 1991, when DEA Agent Jefferson Moran and Pablo Rivera, a member of the Police of Puerto Rico assigned to the DEA, met with Oscar Gonzalez Lopez (Oscar) at a shopping center in Rio Piedras, Puerto Rico. DEA Agent Moran was introduced to Oscar by Agent Rivera as being interested in buying cocaine or heroin. Oscar made a telephone call from a public phone booth. He then asked the agents for $250 to obtain two samples of heroin. After obtaining the money, he accompanied the agents to Domenech Avenue, where he left the car and headed in the direction of defendant's restaurant. He returned shortly and gave Agent Moran a cigarette package containing two separate samples of heroin. Between August 23 and 29, Oscar and Agent Moran discussed, mostly by telephone, the purchase of an ounce of heroin for $7,500. On August 29, Oscar and the two agents met and went together to defendant's restaurant. At the restaurant they were introduced to Victor Rodriguez Alvarez (Victor). Victor asked for the payment of $7,500 before turning over the heroin. After receiving the money, he went into the restaurant and gave it to the bartender, Edgar Rodriguez Velazquez (Edgar).[1] Edgar then gave Victor the heroin, who delivered it to Agent Moran. Victor went back into the restaurant and asked if defendant had called and Edgar said "No." Later, defendant called Edgar and was told that Victor had delivered the merchandise and he, Edgar, had the $7,500. Sometime later defendant came to the restaurant and the $7,500 was turned over to him by Edgar.
 
 
 5
 On September 13, 1991, Agent Rivera was called by Victor and it was agreed that Victor would sell Rivera an ounce of heroin for $7,000. Agent Rivera then proceeded to defendant's restaurant and asked Edgar where Victor was. Defendant was present when the inquiry was made. Rivera was told that Victor was at a nearby pizzeria. Rivera made the "buy" at the pizzeria. He paid Victor $7,000 and received from him an ounce of heroin. After the transaction, Victor went to defendant's restaurant and met with defendant, Edgar, and Daniel Alberto Atilio Adinolfi (Atilio). The $7,000 was given to Atilio, who passed it to Edgar, who put it under the counter.
 
 
 6
 On September 25, 1991, Agent Moran called defendant's restaurant and asked for Victor. Defendant answered the phone and after the inquiry, put Edgar on the line. Moran asked Edgar to have Victor call him. Later Victor called Agent Rivera and they set up a meeting at the pizzeria near defendant's restaurant. Before meeting Rivera at the pizzeria, Victor went to defendant's restaurant and obtained an ounce of heroin from Atilio. Defendant and Edgar were at the restaurant at the time the heroin was obtained. Victor delivered the heroin to Rivera in return for the payment of $7,000. Victor returned to the restaurant, gave the money to Atilio and asked for his commission. Atilio refused to give Victor a commission; instead he referred him to defendant. Defendant told Victor that no commission would be paid because Victor owed him $200. This was the end of Victor's dealings with the undercover agents. Presumably, defendant and his cohorts found out that he had been dealing with a DEA agent.
 
 
 7
 In late November or early December, the DEA recruited a confidential informant, Eliezer Gallegos, to join its undercover operation. On December 5, Gallegos met with defendant and Atilio at the restaurant where the purchase of one-half of a kilogram of cocaine for $5,000 was discussed. On December 6, another negotiation meeting was held at the restaurant. At the end of the conversation, Atilio told Gallegos that they would take a ride and complete the deal. Defendant had told Atilio: "If he is going to buy the car, take him around for a ride so he will get acquainted with it." Gallegos understood this to mean that the cocaine was in a car. Gallegos and Atilio left the restaurant, got into a car, and drove around the block. The "buy" was made in the car; Gallegos paid Atilio $5,000 and received half a kilogram of cocaine. During the drive around the block they were followed by Jorge Omar Lopez Almeida, who was riding a motorcycle. Presumably, this was to protect the "buy."
 
 
 8
 Later that same day, Gallegos called the restaurant and told Edgar that the half kilo of cocaine was short by six grams. On December 11, Gallegos called Atilio and told him that the cocaine he had bought was six grams less than the amount agreed upon. Atilio promised Gallegos that he would make up the shortage the next day and sell him a sample of heroin for $200. Gallegos went to the restaurant the next day. Defendant was at a table with two unknown persons. Atilio was at another table with Edgar. Gallegos asked Atilio for the six grams of cocaine and the heroin sample. He was told by Atilio to wait because defendant was busy. A little later Atilio went over to defendant who gave him a package. Atilio passed the package to Gallegos. It contained six grams of cocaine and a heroin sample. The next day Gallegos went to the restaurant and paid Edgar $200 for the heroin sample.
 
 
 9
 It was stipulated that the drugs bought by the undercover agents and the confidential informant tested out as heroin and cocaine.
 
 II.
 DISCUSSION
 A. The Rule 29 Motion[2]
 
 10
 Defendant argues that the district court erred in denying his Fed.R.Crim.P. 29 motion for judgment of acquittal. In reviewing the denial of a Rule 29 motion, we consider all the evidence, draw all reasonable inferences therefrom, and resolve all issues of credibility in the light most favorable to the government, in order to determine whether a jury could have reasonably concluded that defendant was guilty beyond a reasonable doubt. Mena-Robles, 4 F.3d at 1031; Hernandez, 995 F.2d at 311.
 
 
 11
 The thrust of defendant's argument is that he was simply an honest businessman and restauranteur whose misadventure it was that drug dealers operated on his premises without his blessing, knowledge, or participation. In support of this position, defendant points out that none of the myriad DEA recordings or photographs introduced at trial capture him conducting an illicit drug transaction. We have reviewed the record carefully and, while we concur with defendant's contention that the government did not produce any direct evidence of his complicity, we must reject both his premise and his conclusion, because neither has a legal basis. To the contrary, it is a well-established principle that,
 
 
 12
 [t]he evidence [introduced against the defendant at trial] may be entirely circumstantial, and need not exclude every reasonable hypothesis of innocence, that is, the factfinder may decide among reasonable interpretations of the evidence.
 
 
 13
 United States v. Batista-Polanco, 927 F.2d 14, 17 (1st Cir. 1991)(citations omitted).
 
 
 14
 Defendant has attempted to rely on "mere presence" as a defense to the charges of conspiracy, possession, and distribution. Of course, in establishing a conspiracy charge, the prosecution must prove intent to agree and commit the substantive offense beyond a reasonable doubt, Mena-Robles, 4 F.3d at 1031. The evidence for such proof, however, may be either express or inferred from conduct, and if circumstantial evidence raises reasonable inferences sufficient to refute the claim of mere presence, it is enough to sustain the verdict. Id.; Batista-Polanco, 927 F.2d at 18. Further informing this analysis is the oft-repeated truism that participants in a criminal conspiracy are unlikely to permit or tolerate the presence of extraneous observers, and a jury is presumed capable of drawing such an inference. United States v. Ortiz, 966 F.2d 707, 712 (1st Cir. 1992).
 
 
 15
 In the case at bar, the evidence shows that all the drug transactions which form the basis of the indictment took place in and around "Mi Pequena Columbia," defendant's restaurant. There is ample evidence that defendant was present either before, after, or during each of the "buys." The jury could reasonably infer that the drug transactions were authorized and controlled by defendant and that he was the source of supply. Accordingly, we reject defendant's contention that the evidence of his guilt was insufficient.
 
 B. Sentencing Claims
 
 16
 The court enhanced defendant's base offense level by four levels for his role as an organizer in the drug trafficking conspiracy, U.S.S.G. Sec. 3B1.1, and by two levels for obstruction of justice, U.S.S.G. Sec. 3C1.1. At the same time, the court denied defendant's request for a two level downward adjustment for acceptance of responsibility. Defendant argues that the court erred in each of these determinations.
 
 
 17
 We will disturb supported findings of a sentencing court only when our review of the record "convinces us that a grave mistake was made." United States v. Bradley, 917 F.2d 601, 605 (1st Cir. 1990).
 
 1. Role in the Offense
 
 18
 Based on the number of individuals involved, the nature of the enterprise, and the defendant's leadership role, the district court imposed a four level upward adjustment to defendant's base offense level under U.S.S.G. Sec. 3B1.1(a).[3] Because role in the offense adjustments are necessarily fact specific, the findings of the sentencing court are reviewed under a deferential standard. See United States v. Morillo, 8 F.3d 864, 873 (1st Cir. 1993); United States v. Akitoye, 923 F.2d 221, 227 (1st Cir. 1991). The "standard of review for the sentencing court's upward adjustment for defendant's leading role in the offense ... [is] clear error." United States v. Reyes, 927 F.2d 48, 50 (1st Cir. 1991).
 
 
 19
 The evidence established that the drug activity took place almost exclusively in and around defendant's restaurant. Moreover, there was testimony to the effect that transactions took place only when defendant was entering, leaving, or physically present at the restaurant. From this alone the judge could have reasonably concluded that defendant was the organizer and leader of a group of drug dealers. Added to this we have the testimony of one of the co-conspirators, Victor Rodriguez, that defendant ran the operation, and that he alone could determine whether Victor was to be paid a commission on the sales he made.
 
 
 20
 We reject defendant's claim of error as to the four- level enhancement for his role in the offense as meritless.
 
 2. Obstruction of Justice
 
 21
 At trial, Victor Rodriguez testified that defendant had approached him during their pretrial detention and requested that Victor write a letter to the trial judge explaining that defendant had no involvement in the counts charged in the indictment. This letter was solicited as a quid pro quo, in exchange for which defendant would see to it that Victor's family was adequately provided for while Victor was incarcerated. Victor also testified, and the presentence report states, that co-conspirator Atilio threatened that Victor would be harmed if he were to provide assistance to the government. This was clearly an attempted obstruction of justice. Section 3C1.1[4] of the guidelines calls for an enhancement of two levels for such conduct. Such an enhancement, like that for a leadership role in the offense, is fact-based and therefore reviewed for clear error. United States v. Gonzales, 12 F.3d 298, 299 (1st Cir. 1993); Akitoye, 923 F.2d at 229. There was no error, clear or otherwise, by the court in applying the obstruction of justice guideline.
 
 3. Acceptance of Responsibility
 
 22
 Defendant has a threshold problem in attacking the lower court's determination that he did not qualify for a downward adjustment for acceptance of responsibility. In Gonzales, we held that "[o]nly 'extraordinary cases' qualify for an acceptance of responsibility credit following an enhancement for obstruction of justice." Gonzales, 12 F.3d at 300, (quoting U.S.S.G. Sec. 3E1.1, comment (n.4)). In this case, there was testimony at trial and at the sentencing hearing showing that, even after being incarcerated, defendant actively sought to mislead the trial court in order to escape responsibility for the charges against him. These are the same charges for which he now alleges to have accepted responsibility.
 
 
 23
 Only at his presentence interview and in his allocution at the sentencing hearing did defendant accept responsibility for his actions, and he did so only in a limited manner. The district judge found that "the defendant had not" accepted responsibility within the meaning of the guidelines, and that the acceptance made was not authentic and was devoid of remorse. Findings as to these factors will not be reversed absent clear error. United States v. Ocasio-Rivera, 991 F.2d 1, 4-5 (1st Cir. 1993); United States v. Royer, 895 F.2d 28, 29 (1st Cir. 1990) ("Because the sentencing judge has the unique opportunity of observing the defendant, hearing his allocution, and evaluating acceptance of responsibility ... against the backdrop of the case as a whole, his determination is entitled to a great deal of respect.").
 
 
 24
 Accordingly, we reject defendant's claim that he was entitled to a two level reduction for acceptance of responsibility.
 
 The judgment of the district court is
 
 25
 Affirmed.
 
 
 
 [1]
 Named in indictment as John Doe a/k/a Edgardo Rodriguez
 
 
 [2]
 Fed.R.Crim.P. 29 states, in relevant part: "The court on motion of defendant or on its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses."
 
 
 [3]
 Section 3B1.1(a) provides that "If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels."
 
 
 [4]
 Section 3C1.1 states: "If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels."