# United States Court of Appeals
## For the First Circuit

No. 07-1912

UNITED STATES,

Appellee,

v.

WALTER MANGUAL-SANTIAGO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Torruella and Howard, Circuit Judges,
and DiClerico,[*] District Judge.

Rafael Castro Lang for appellant.
Desireé Laborde-Sanfiorenzo, Assistant United States Attorney,
with whom Rosa Emilia Rodríguez-Vélez, United States Attorney,
Nelson Pérez-Sosa, Assistant United States Attorney, and Thomas F.
Klumper, Assistant United States Attorney, were on brief for
appellee.

April 17, 2009

[*]Of the District of New Hampshire, sitting by designation.

**DICLERICO, District Judge**.  Appellant Walter Mangual-Santiago ("Mangual") was convicted after a jury trial of conspiracy to possess with intent to distribute cocaine and heroin (Count One) and to commit money laundering (Count Five).  He was sentenced to a term of imprisonment of 324 months.  For the reasons that follow, we affirm.

Mangual appeals his conviction under Count One, arguing that while he was charged and convicted of a single conspiracy, the evidence at trial showed that there were two separate conspiracies and that prosecution for the first conspiracy was barred by the five-year statute of limitations under 18 U.S.C. § 3282.  On that ground, he contends that the court erred by denying his motions for acquittal and by failing to give a multiple conspiracies instruction to the jury.  Mangual further challenges his convictions under Counts One and Five, arguing that the court abused its discretion by admitting certain testimony and evidence, by denying his request for a continuance, and by denying his motion to dismiss the indictment based on the government's delay in bringing him before a federal magistrate.

I.

A.  Background Facts

The government's evidence consisted of the testimony from the following witnesses: Antonio Robles Ramos ("Antonio"), a

coconspirator; Samuel Robles Ramos ("Samuel"), a coconspirator and Antonio's brother; Fidel Hernandez Mattei ("Fidel"), a coconspirator and a cousin of the Robles';[1] Hilario Marrero Rivera ("Marrero"), a sergeant with the Ponce, Puerto Rico, Drug Squad; Eddie Vidal-Gil, an officer with the Puerto Rico Police Department and an agent of the federal Drug Enforcement Agency task force in Ponce; Angel Pardo ("Pardo"), an officer with the Orlando, Florida, Police Department and an agent of the U.S. Marshals Fugitive Task Force in Orlando; and Alberto Borelli Irizarry ("Borelli"), an internal investigator for Western Bank. Mangual did not present any evidence or call any witnesses at trial.

The facts are recited in the light most favorable to the verdicts being appealed. United States v. Sanchez-Badillo, 540 F.3d 24, 27 (1st Cir. 2008). Antonio met Mangual in October of 1991, through Fernando Perez ("Perez"), a mutual acquaintance, when Antonio provided Mangual with two kilograms ("kilos") of cocaine. Mangual sold the cocaine and made cash payments to Antonio. Following this transaction, Antonio and Perez began working together to import cocaine into Puerto Rico for distribution. They worked with an individual, known only as "Mr. Jockey," who had cocaine connections in Columbia.

---

[1]Antonio, Samuel, and Fidel were charged, convicted, and sentenced under a previous indictment.

-3-

Antonio would travel by boat to a specified location off the coast of Puerto Rico, where planes from Columbia would drop bales of cocaine into the ocean. Antonio would retrieve the bales from the water and transport them to the mainland where Perez or Samuel, Antonio's brother, would pick up the cocaine and store it until they received further delivery instructions from Mr. Jockey. On one pick-up in 1993, Antonio met with Mangual to sell him 200 kilos of cocaine, but Mangual refused to purchase the kilos because he had obtained a cheaper price elsewhere. During this time, Antonio was aware that Mangual operated a separate drug point and had other drug suppliers.

On October 7, 1993, Sergeant Marrero and other Puerto Rico police officers executed a search warrant at an apartment in Ponce. The warrant was the result of an investigation conducted by the Puerto Rico Police Department regarding the contents of an apartment at which Mangual and another individual, Melvin Alvarez, had been staying. The officers found Mangual inside the apartment, along with three quarters of a kilo of cocaine, a scale, $1,000 in cash, jewelry, marijuana, and a loaded pistol. Based on the items found during the search, Mangual was convicted and sentenced to a term of imprisonment. He was released in 1996.

While Mangual was in jail, Antonio and Perez continued their drug trafficking operations, importing at least 500 kilos of cocaine per year. In 1994, Antonio's cousins, Fidel and Carlos

Hernandez Mattei ("Carlos"), sold forty kilos of cocaine to Antonio, and thereafter became members of his drug trafficking organization.

From the summer of 1994 until October of 1995, Antonio testified that he and Perez were not involved in any drug transactions. In late 1995, Perez introduced Antonio to Aureliano and Elliot Giraud Pinero (the "Girauds"), brothers who had cocaine connections in Columbia. Antonio and his organization, including his brothers, Samuel and David Robles Ramos ("David"), his cousins, Fidel and Carlos, and other individuals, worked with the Girauds to import cocaine into Puerto Rico. While working with the Girauds, Antonio continued to coordinate the cocaine pick-ups. In 1998, Antonio began working with the Girauds to transport cocaine from Puerto Rico to the United States mainland.

In 1996, Mangual was released from prison, and he approached Antonio for work. Due to his recent incarceration, he was having problems with his other suppliers and his drug point. Antonio agreed to sell Mangual two kilos of cocaine. Mangual sold the cocaine and made payments to Antonio in cash. Later that year, Antonio began selling heroin to Mangual. From December of 1996 until March of 1997, Mangual purchased a minimum of four kilos of heroin from Antonio on approximately ten separate occasions, paying Antonio in cash each time. On at least three occasions, Samuel delivered the heroin directly to Mangual.

In 1997, Antonio received an order from the Girauds to organize the pick-up and distribution of a shipment of 800 kilos of cocaine from Columbia, which would be dropped at sea. Samuel, Mangual, and several other individuals were involved in this pick-up. Through Antonio, the Girauds gave Mangual cash, which he used to purchase a boat and engines. The cocaine pick-up was never completed, however, because the captain and crew were unable to find the pick-up site at sea.

In June of 1998, the Girauds and Antonio transported a shipment of cocaine through Jacksonville, Florida, to New York. They left twenty-three kilos of cocaine in Jacksonville, and Antonio offered to sell them to Mangual. Samuel, Elliot Giraud, and another individual met Mangual in Florida, agreed to the deal, and sold him the cocaine. Mangual paid for the cocaine in cash.

Antonio testified at trial that he funneled the money he was receiving from drug trafficking through a business he and David ran, for purposes of laundering the money. He also testified that as far as he was aware, Mangual's only other source of income, other than drug trafficking, was through his tire business, operated out of his home in La Cuarta, Puerto Rico, and through cockfighting. Through 1999, Antonio and Mangual also spent large amounts of cash earned from drug trafficking at cockfights, on cars, Jetskis, and in bars and clubs.

B.    Procedural History

In 1999, a member of Antonio's organization provided information to the government regarding the drug trafficking activities of Antonio, Samuel, Fidel, and forty-seven other individuals, which ultimately led to their indictment and arrest on charges of drug trafficking, conspiracy to commit drug trafficking, and money laundering.  Mangual was not named in the indictment.  Antonio, Samuel, and Fidel pled guilty and were sentenced to terms of imprisonment.  In 2000, Antonio and Samuel each entered into a cooperation agreement with the government, and their sentences were reduced upon motions from the government.  The information provided by them led to indictments against Mangual, the Girauds, David, and fifteen other individuals.

A sealed indictment was returned against Mangual on December 16, 2003, and an arrest warrant was issued.  The indictment was unsealed on March 3, 2004.  Efforts to arrest Mangual were unsuccessful, and he was declared a fugitive from justice until he was apprehended on February 28, 2006, in Orlando, Florida, at a house which he was renting.  Agent Pardo, in his capacity as an agent of the U.S. Marshals Fugitive Task Force, participated in Mangual's arrest.  On Mangual's person, officers found $2,500 in cash, several false identifications, and credit cards with false names.  A search of Mangual's house produced marijuana, cocaine, scales, and $10,000 in cash.

Mangual was transferred to the state authorities for prosecution under Florida law as a result of the drugs found during his arrest. He ultimately pled guilty to the state charges and was sentenced on June 21, 2006, to time served. On June 23, 2006, 110 days after his arrest, he was taken before a federal magistrate in Orlando for his initial appearance on the federal conspiracy charges and a public defender was appointed to represent him for the proceedings in Orlando.

Mangual was removed to Puerto Rico and made his initial appearance in the Puerto Rico district court on August 3, 2006, at which he pled not guilty to the charges against him. The court appointed counsel on August 7, 2006, and scheduled trial for November of 2006. On November 9, 2006, Mangual filed a pro se motion asking that his court-appointed counsel be removed and requesting a continuance so that he could hire new counsel. Following a hearing, the court granted his motion, gave Mangual until December 15 to hire new counsel, and rescheduled the trial to January 8, 2007. Mangual's new counsel filed his appearance on December 15 and requested a continuance on the ground that he needed more time to prepare for trial, given that he had scheduled a vacation from December 26, 2006, through January 8, 2007. The court summarily denied the request on January 3, 2007, while Mangual's counsel was on vacation. The trial began, as scheduled, on January 8, 2007.

Included in the evidence introduced by the government at trial to support the money laundering conspiracy charge were Mangual's account records at Western Bank from 1998 through 2004 and a record of Mangual's purchases at Costco, a wholesale food and retail store, where he had established a membership under a false name. The government also introduced a certification from the Puerto Rico Treasury Department showing that Mangual did not file income tax returns for the years 1996 through 2004.

On the day before the close of evidence, Mangual filed a motion to dismiss his indictment in whole or in part, on the ground that the evidence showed that he was involved in two separate conspiracies and that prosecution for the first conspiracy was barred by the five-year statute of limitations under 18 U.S.C. § 3282. In the alternative, Mangual requested that a limiting instruction be given to the jury not to consider evidence of the first conspiracy. The court declined to decide the motion at that time, and Mangual raised both arguments at the close of evidence in a motion for acquittal under Federal Rule of Criminal Procedure 29 ("Rule 29 motion"). The court denied the motion.

After the jury charge was given, Mangual objected, referencing his motion to dismiss based on evidence of multiple conspiracies. The court stated that the evidence did not support his claim and that it would not instruct the jury on multiple conspiracies. The jury found Mangual guilty on Counts 1 and 5 on

January 17, 2007.  On January 24, 2007, Mangual again moved for acquittal, pursuant to Rule 29, or, in the alternative, for a new trial pursuant to Federal Rule of Criminal Procedure 33.  The district court denied the motion.

## II.

On appeal, Mangual argues that there was a variance between the indictment, which charged a single conspiracy, and the evidence produced at trial, which he contends showed that he was involved in two separate conspiracies.  On this ground, he challenges the district court's denial of his motions for acquittal or for a new trial, as well as the court's failure to instruct the jury on multiple conspiracies.  He also challenges the admission of certain evidence at trial, the denial of his request for a continuance, and the denial of his motion to dismiss based on the government's delay in bringing him before a federal magistrate.

## A.  Multiple Conspiracies

Mangual argues that the evidence at trial showed that he was involved in two separate conspiracies, the first from 1991 through 1994, and the second beginning in 1996.  He contends that prosecution for the first conspiracy was barred by the statute of

limitations under § 3282.[2]   The government contends that the evidence does not support the existence of two conspiracies.[3]

1.  Variance

Mangual contends that the evidence presented at trial constituted a variance from his indictment.  He argues that the district court erred in denying his motions for acquittal and his request to exclude all evidence of actions prior to 1996, due to the prejudicial effect that evidence of the "first" conspiracy would have on the jury.

"A variance occurs when the crime charged remains unaltered, but the evidence adduced at trial proves different facts than those alleged in the indictment."  United States v. Yelaun, 541 F.3d 415, 419 (1st Cir. 2008).  A variance is grounds for reversal only if it is prejudicial, that is, if it affects the

---

[2]Section 3282 provides, in pertinent part: "Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed."  18 U.S.C. § 3282(a).

[3]The government also argues that to the extent Mangual challenges his money laundering conspiracy conviction based on his multiple conspiracy theory, his argument is waived.  We agree. Mangual makes a terse reference to his money laundering conspiracy conviction, arguing only that it be reversed.  See United States v. Soto-Beníquez, 356 F.3d 1, 43 (1st Cir. 2004); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").  We disagree with Mangual that his argument regarding the narcotic conspiracy necessarily incorporates a challenge to the money laundering conspiracy.

defendant's "substantial rights." United States v. DeCicco, 439 F.3d 36, 47 (1st Cir. 2006). To determine whether there was a variance, we "review the record to determine whether the evidence and reasonable inferences therefrom, taken as a whole and in the light most favorable to the prosecution, would allow a rational jury to determine beyond a reasonable doubt" that a single conspiracy existed. United States v. Mena-Robles, 4 F.3d 1026, 1031 (1st Cir. 1993). The jury's finding, however, need not be inevitable. United States v. Boylan, 898 F.2d 230, 243 (1st Cir. 1990).

In determining whether the evidence supports the existence of a single conspiracy, we ultimately look at the totality of the evidence. Sanchez-Badillo, 540 F.3d at 29. The following factors are considered helpful, however, in evaluating the evidence: "(1) the existence of a common goal, (2) interdependence among the participants, and (3) overlap among the participants." Id. Although conflicting inferences may arise, so long as the evidence is adequate to permit a reasonable trier of fact to have found a single conspiracy beyond a reasonable doubt, the jury's finding will not be disturbed on appeal. See Boylan, 898 F.2d at 243.

The common goal factor is given "wide breadth." Sanchez-Badillo, 540 F.3d at 29. "[A] 'goal of selling cocaine for profit'" or "furthering the distribution of cocaine is . . .

-12-

sufficient evidence" of a common goal.  <u>United States</u> v. <u>Portela</u>, 167 F.3d 687, 695 (1st Cir. 1999) (quoting <u>United States</u> v. <u>Wilson</u>, 116 F.3d 1066, 1075 (5th Cir. 1997) (reversed in part on other grounds)).  We will find interdependence among the participants where "'the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme.'" <u>Id.</u> (quoting <u>Wilson</u>, 116 F.3d at 1075).  "Each individual must think the aspects of the venture interdependent, and each defendant's state of mind, and not his mere participation in some branch of the venture, is key." <u>Id.</u>  Finally, the overlap factor is "satisfied by the pervasive involvement of a single 'core conspirator,' [or] hub character." <u>Id.</u>  (quoting <u>Wilson</u>, 116 F.3d at 1076).

In applying these factors, we recognize that the existence of a single conspiracy does not depend upon every participant having knowledge of every other participant, or of the details of the conspiracy.  <u>Sanchez-Badillo</u>, 540 F.3d at 29.  Nor is it necessary that each coconspirator participate in every aspect of the conspiracy, <u>id.</u>, or "that the membership remain static," <u>Portela</u>, 167 F.3d at 696.

Beginning with the cocaine transaction in 1991, Antonio, Perez, and Mangual worked together towards the common goal of selling cocaine for profit.  In 1996, when Mangual alleges a new conspiracy began, Antonio, Mangual, and others continued to operate under this same goal.  Mangual contends that the purpose changed

when Antonio began working with the Girauds to transport cocaine beyond Puerto Rico and into the continental United States. However, Antonio did not begin working in this capacity until 1998, and moreover, the goal of the operations remained the same as in 1991 - to sell cocaine for profit.

The evidence also demonstrated interdependence among Antonio and the members of his organization, both before and after the Girauds became involved. Antonio was dependent upon the carriers to transport and store the cocaine, and upon the distributors, such as Mangual, to sell the cocaine for cash. Antonio testified that he always relied upon the distributors to sell the cocaine because that was not a job he wanted to undertake. The distributors, in turn, relied upon Antonio to obtain the cocaine. Their relationships did not change, even after Antonio began working with the Girauds in 1996.

The evidence also established an overlap among the participants. Antonio was a "hub character" during both time periods, and he maintained his leadership and coordinator role. There were also numerous additional consistent participants: Samuel, Fidel, and Mangual all worked with Antonio before, and after, he began working with the Girauds.

Mangual asserts, however, that the conspiracy was abandoned, or terminated, in 1994, because he was in jail, and

-14-

Antonio and Perez had retired.[4]  Because Mangual acknowledges that a conspiracy existed, the law presumes that the conspiracy continued, and that he continued to participate, unless he makes "an affirmative showing" that the conspiracy was abandoned or terminated, or that he withdrew from it.  United States v. Piper, 298 F.3d 47, 53 (1st Cir. 2002); see United States v. Harriston, 329 F.3d 779, 783 (11th Cir. 2003) ("A conspiracy is deemed to have continued as long as the purposes of the conspiracy have neither been abandoned nor accomplished and the defendant has not made an affirmative showing that the conspiracy has terminated.").  When coconspirators refrain, for a period of time, from engaging in drug transactions, this does not, in and of itself, constitute termination or abandonment of the conspiracy.  See United States v. Williams, 205 F.3d 23, 33 (2d Cir. 2000) ("A single conspiracy is not transposed into a multiple one simply by lapse of time, change in membership, or a shifting emphasis in its locale of operations.").

Mangual argues that Antonio and Perez retired from the drug business in May or June of 1994.[5]  Antonio testified that he

---

[4]The government presumes that Mangual argues that he withdrew from the conspiracy in 1993.  Upon review of Mangual's brief, however, we find that he does not assert affirmative withdrawal, but rather argues that his arrest, together with the alleged retirement of Antonio and Perez, effectively terminated the "first" conspiracy.

[5]To the extent Mangual refers to grand jury testimony to support his argument, we will not consider such testimony on appeal

-15-

and Perez did not engage in any drug transactions between June of 1994 and October of 1995. Other evidence at trial, however, demonstrated that Antonio and his organization continued drug transactions throughout this period. For example, Antonio also testified that he and Perez organized the pick up of at least one load of cocaine, amounting to at least 500 kilos, during 1994 and 1995. Further, Fidel testified that in 1994 he delivered and sold forty kilos of cocaine to Antonio, and that he picked up a bale of cocaine for Antonio in 1995.

Even if the evidence showed that Antonio and Perez refrained from drug transactions for a period between 1994 and October 1995, the evidence admitted at trial does not suggest that Antonio and Perez abandoned the drug conspiracy. Antonio testified that after picking up three loads of cocaine in one day in 1996, he did not have to work the rest of the year. The jury could reasonably infer from this testimony that Antonio's drug business was sufficiently profitable that it did not require him to work year-round. A sixteen-month gap between drug pick-ups, in and of itself, does not prove that Antonio or Perez abandoned the drug conspiracy. See United States v. Arnold, 117 F.3d 1308, 1314-15 (11th Cir. 1997) (recognizing that money laundering, living off "prior illegal drug proceeds," and continued contact with coconspirators constitute activities which extend drug conspiracy);

---

because it was not submitted as evidence at trial.

cf. United States v. Richardson, 532 F.3d 1279, 1286 (11th Cir. 2008) ("[N]othing in the evidence could have led the jury to conclude that . . . [the defendant] ever stopped dealing drugs for any material length of time.") (emphasis added).  The evidence was sufficient, therefore, to establish a single conspiracy, and there was no variance between the evidence produced at trial and the indictment.

Even if a variance did exist, however, Mangual has not shown prejudice.  "A variance is fatal only if the defendant shows prejudice."  United States v. Trainor, 477 F.3d 24, 35 (1st Cir. 2007).  A variance between a charged single conspiracy and evidence of separate conspiracies at trial is prejudicial if the defendant was convicted based on evidence pertaining to a separate conspiracy of which he was not involved.  See United States v. Dunbar, 553 F.3d 48, 61-62 (1st Cir. 2009).  "Put another way, multiple conspiracy is not a defense unless it creates reasonable doubt about whether the defendant is guilty of the charged conspiracy." Id. at 62 (internal quotation marks omitted).  Ordinarily, when the evidence shows that the defendant was involved in criminal activities that constituted separate conspiracies, no prejudice arises because the defendant, himself, engaged in charged conduct attributable to each conspiracy.  Id.

In this case, however, Mangual argues that although he was involved in the "first" and "second" conspiracies, the statute

-17-

of limitations bars his conviction for conduct that was part of the "first" conspiracy. He contends that he is prejudiced because evidence of the first conspiracy at trial creates a reasonable doubt as to whether he was convicted of a conspiracy that is barred by the statute of limitations. Mangual's theory fails on several grounds.

Mangual does not contend that the "second" conspiracy, involving Antonio, the Girauds, and others, which continued through December of 2002, was barred by the statute of limitations. The evidence at trial of Mangual's participation in the "second" conspiracy was more than sufficient to support his conviction.[6] In this case, even if prosecution for the "first" conspiracy were barred by the statute of limitations, the evidence of the "first" conspiracy at trial does not create reasonable doubt about the basis of Mangual's conviction.

In addition, expiration of the limitations period would not necessarily have caused the evidence of his activities undertaken as part of the "first" conspiracy to be inadmissible. See Richardson, 532 F.3d at 1289 ("[T]he evidence outside of the statute of limitations . . . would have most likely been admitted under [Federal] Rule [of Evidence] 404(b) in order to prove how [the defendant] became involved with and knowledgeable about the

---

[6]Mangual does not appeal his sentence or argue that he was prejudiced because his sentence was increased based on his involvement in the "first" conspiracy.

drug trade."). Even if the trial court had agreed with him that the evidence showed two separate conspiracies, Mangual makes no effort to show that evidence of the "first" conspiracy would have been inadmissible at trial.

Mangual has not shown that there was a variance between the conspiracy charged and the evidence at trial or that, if a variance occurred, he was prejudiced by it. Therefore, the district court did not err by denying Mangual's motion to dismiss the indictment or his request to exclude all evidence before 1996.

2. <u>Jury Instructions</u>

Mangual argues that the trial court erred by failing to give a jury instruction on multiple conspiracies. He contends that such an instruction was necessary because there was evidence at trial which showed two conspiracies and that evidence of his conduct in furtherance of the "first" conspiracy was barred by the statute of limitations. We review the district court's refusal to give a multiple conspiracies instruction under the circumstances of this case for abuse of discretion. <u>United States</u> v. <u>De La Cruz</u>, 514 F.3d 121, 139 (1st Cir. 2008).[7] The trial court's failure to give a multiple conspiracies instruction in this case will not be

---

[7]It is not clear from the record whether Mangual preserved this issue. <u>See</u> <u>United States</u> v. <u>Upton</u>, No. 05-1593, __ F.3d __, (1st Cir. Mar. 5, 2009). However, in an abundance of caution, we address his argument, applying the abuse of discretion standard of review.

reversed unless Mangual can show that he suffered substantial prejudice.  Id.

For the reasons explained above, Mangual has not established that he suffered from substantial prejudice.  Further, the jury charge given by the district court explained that to find Mangual guilty of the drug conspiracy in Count One, the jury had to find that the government proved, beyond a reasonable doubt, the agreement "specified in the indictment, in Count 1 . . . and not some other agreement . . . ."  Trial Tr. Jan. 17, 2007, at 15 (emphasis added); see id. at 139-40.  Due to the district court's clear instruction, and for the reasons explained above, we find no abuse of discretion.

B.  Evidentiary Issues

Mangual argues that the evidence admitted at trial regarding his 1993 arrest, 2006 arrest, bank account records, and Costco purchases was inadmissible and that the district court erred in admitting this evidence over his objections.  The district court's decision to admit evidence is reviewed for abuse of discretion. See United States v. Pierre, 484 F.3d 75, 84 (1st Cir. 2007).  "[A]n abuse of discretion occurs when a relevant factor deserving of significant weight is overlooked, or when an improper factor is accorded significant weight, or when the court considers the appropriate mix of factors, but commits a palpable error of judgment in calibrating the decisional scales."  United States v.

Gilbert, 229 F.3d 15, 21 (1st Cir. 2000) (internal quotation marks omitted).

1. Agent Marrero's Testimony

Mangual argues that the district court erred in admitting Agent Marrero's testimony, regarding his 1993 arrest and the narcotics found during the search of the apartment, as direct proof of the charged conspiracy. He also contends that if the testimony were admissible under Federal Rule of Evidence 404(b), the district court erred in admitting the testimony because he was not given prior reasonable notice as required by Rule 404(b).

"Evidence that a defendant on trial for one crime has been involved in another crime or bad act is inadmissible under Fed. R. Evid. 404(b) if it is offered solely to prove the criminal character of the defendant or his propensity to commit crimes of the sort for which he is on trial." United States v. Escobar-deJesus, 187 F.3d 148, 169 (1st Cir. 1999). However, "Rule 404(b) applies just to evidence of other bad acts or crimes - those other than the crime charged. Where evidence of 'bad acts' is direct proof of the crime charged, Rule 404(b) is, of course, inapplicable." United States v. Arboleda, 929 F.2d 858, 866 (1st Cir. 1991) (internal quotation marks omitted) (emphasis in original).

When determining whether evidence constitutes direct proof of a narcotics conspiracy, we have looked to whether the

contested incident shares "temporal proximity and factual similarity" with the conspiracy. Escobar-deJesus, 187 F.3d at 168. In addition, "this court has held that scales, firearms and large amounts of cash are each probative of the intent to distribute narcotics." United States v. Ford, 22 F.3d 374, 383 (1st Cir. 1994).

When the police officers found Mangual in the Ponce apartment, the officers also found a loaded firearm, three quarters of a kilo of cocaine, a scale, and approximately $1,000 in cash, among other items (collectively, "Ponce evidence"). The arrest occurred in 1993, during the conspiracy period, and in the area in which the indictment alleged that Mangual distributed cocaine. Although there was no evidence that the cocaine found in Mangual's possession came from Antonio, the Ponce evidence corroborates Antonio's testimony that Mangual was a cocaine distributor at the time of the charged conspiracy. As evidence of the conspiracy, the gun, cocaine, and money are part of the charged crime, which does not implicate Rule 404(b). Therefore, we do not address Mangual's argument that he was not provided reasonable prior notice of Agent Marrero's testimony as required by Rule 404(b).

2. 2006 Arrest

Mangual contends that Agent Pardo's testimony regarding the cocaine and marijuana, which were found in the Florida residence where he was arrested in 2006, should have been excluded

as evidence of subsequent bad acts, as irrelevant, and as unfairly prejudicial.[8] See Fed. R. Evid. 404(b), 401, 403. He argues that the testimony regarding the illegal drugs found when he was arrested is outside the scope of the charged conspiracy, which ended four years earlier. He also argues that the evidence contributed to his conviction on the conspiracy charge.

The government counters that Pardo's testimony about the drugs found when Mangual was arrested was admissible as evidence of Mangual's consciousness of guilt. See, e.g., United States v. Benedetti, 433 F.3d 111, 116 (1st Cir. 2005) (discussing admissibility of flight evidence). The government, however, did not provide any plausible basis to support its consciousness of guilt theory. We see no relation between the drugs and Mangual's consciousness of guilt.

The government also contends that even if the drug evidence were inadmissible, any error was cured by the court's limiting instruction. The court instructed the jury that although they had heard evidence that Mangual might have committed illegal acts other than the charged crimes, he was on trial only for the charged drug conspiracy and money laundering crimes. The court told the jury that they could not consider evidence of other

---

[8]Although the government also argues that evidence of the other items found during Mangual's arrest was admissible under Rule 404(b), Mangual contests only the admissibility of the drugs.

activities for the purpose of convicting Mangual of the charged crimes. Specifically, the court instructed:

> [T]he drugs that were found at the place of his arrest in Florida, . . . are not charged in this indictment, those were dealt with by Florida in a separate case. So you cannot consider those as evidence of guilt in this particular indictment, that cannot be done. Is that clear? You have to keep that very clear in your mind.

An error in admitting evidence pursuant to Rules 401, 403, and 404(b) is harmless as long as "the disputed evidence did not contribute to the verdict." United States v. Ofray-Campos, 534 F.3d 1, 35 (1st Cir. 2008); see also United States v. Garza, 435 F.3d 73, 77 (1st Cir. 2006). When a limiting instruction adequately addresses any prejudice that might arise from improperly admitted evidence and the record lacks evidence that the jury disregarded the instruction, the evidentiary error is harmless. See United States v. Mercado, 412 F.3d 243, 250 (1st Cir. 2005); see also United States v. Bucci, 525 F.3d 116, 127 (1st Cir. 2008) ("[W]e ordinarily presume that jurors will follow limiting instructions.").

The jury was instructed not to consider the drug evidence for the purpose of determining Mangual's guilt.[9] Mangual offers no reason to believe that the jury did not follow the instruction in

_____

[9]To the extent that Mangual also challenges the instruction that was given, he has not shown that his objections were preserved at trial. In any case, we find no error.

-24-

this case.  Given the jury instruction and the strength of the government's case against Mangual, we conclude that the drug evidence could not have affected the outcome of the trial.

3.  Costco Purchases

Mangual argues that the document listing his purchases at Costco beginning in November of 2005 was inadmissible because it was not relevant under Rule 401 and was unfairly prejudicial under Rule 403.  The government argues that the Costco evidence was relevant to show consciousness of guilt and, in the alternative, that any error in admitting the record was harmless.

Because Mangual failed to object to the Costco evidence at trial based on either Rule 401 or Rule 403 grounds, we review this issue for plain error.[10]  See United States v. Griffin, 524 F.3d 71, 81 (1st Cir. 2008).  "We will not find plain error unless (1) an error occurred (2) which was clear or obvious and which not only (3) affected [the defendant's] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  United States v. Flemmi, 402 F.3d 79, 86 (1st Cir. 2005) (brackets and internal quotation marks omitted).

The Costco evidence reflects account activity for a joint account held by Mangual, who used a false name, and Vanessa M.

---

[10]Mangual objected to the admission of the Costco record but based his objection on Federal Rule of Evidence 902(11).  He does not pursue this objection on appeal.

Nance, from November 10, 2005, through January 5, 2006. The record shows that several expensive items were purchased, including two plasma televisions, bottles of Dom Perigon champagne, and a digital camera, among other items. Evidence that Mangual opened a Costco account under a false name, while he was a fugitive from justice, shows an effort to conceal his identity, which is relevant to show his consciousness of guilt. See United States v. Levy-Cordero, 67 F.3d 1002, 1011 (1st Cir. 1995) (holding that fake passport and social security card in defendant's possession, at time when defendant knew police were looking to arrest him, admissible under Rule 404(b) to show consciousness of guilt). Evidence of his purchases at Costco, however, is not indicative of a guilty conscience. We find no other relevant purpose, and the government offers none, for their admissibility.

Mangual has not shown, however, that any error in admitting the Costco evidence prejudiced his substantial rights. "To affect substantial rights, an error must have substantial and injurious effect or influence in determining the verdict." United States v. Hebshie, 549 F.3d 30, 44 (1st Cir. 2008) (internal quotation marks and ellipses omitted).

Mangual contends that the error influenced the verdict because the Costco evidence, together with his bank account records, comprised the only evidence produced at trial to support the charge of conspiracy to commit money laundering and because the

-26-

government referenced his Costco purchases in its closing argument. The Costco evidence showed that Mangual made a few expensive purchases at Costco over the course of two months. The jury heard extensive similar evidence at trial from Antonio and Samuel. They testified that Mangual spent significant amounts on cars and Jet-Skis, and at bars, hotels, and cockfights. It is highly unlikely, therefore, that the Costco evidence had a substantial influence on the jury's verdict.

### 4. Bank Account Activity

Mangual argues that evidence of his bank account activities was not relevant under Rule 401 and was unfairly prejudicial under Rule 403.[11] Mangual further contends that the error was not harmless because it was part of the limited evidence offered at trial to support the charge of conspiracy to commit money laundering. The government argues that the evidence of Mangual's financial activities during the period of the conspiracy was admissible as evidence of the money laundering conspiracy, and that evidence of his financial activities after the conspiracy is relevant because it shows Mangual's consciousness of guilt.

---

[11]Mangual also argues that he did not receive these documents until the day they were introduced at trial and that he was prejudiced by the delayed disclosure. Mangual failed to request a continuance at that time and has failed to demonstrate the required prejudice on appeal. See United States v. Van Anh, 523 F.3d 43, 51 n.7 (1st Cir. 2008). We therefore decline to consider the timeliness of the disclosure.

Mangual argues that the indictment listed the end-date of the money laundering conspiracy as December of 2002, and, therefore, the evidence reflecting his bank account activity anytime after December 2002 was not relevant and was inadmissible. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. "To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency. Relevant evidence is not confined to that which directly establishes an element of the crime." Flemmi, 402 F.3d at 87 (citing United States v. Gonzalez, 110 F.3d 936, 941 (2d Cir. 1997)) (internal quotation marks omitted).

To establish a conspiracy to commit money laundering under 18 U.S.C. § 1956(h), the government must prove that the defendant agreed with one or more coconspirators to

> 1) knowingly conduct a financial transaction 2) involving funds that [the defendant] knew to be the proceeds of some form of unlawful activity and 3) that were in fact the proceeds of a 'specified unlawful activity,' and 4) that [the defendant] knew the transactions to be designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of such unlawful activity.

United States v. Misla-Aldarondo, 478 F.3d 52, 68 (1st Cir. 2007) (quoting 18 U.S.C. § 1956(a)(1)(B)(i)) (emphasis supplied).

In establishing the existence of a conspiracy, the government is not bound by approximate start or end-dates listed in the indictment; the scope of the conspiracy may extend beyond an approximate date. See United States v. Paredes-Rodriguez, 160 F.3d 49, 56 (1st Cir. 1998) ("[T]he reference to approximate dates in an indictment is not binding and thus the scope of the indictment may cover prior events."). Further, evidence of actions which occurred after the conspiracy has ended may also be admissible. See Lutwak v. United States, 344 U.S. 604, 617 (1953) ("It does not necessarily follow that acts and declarations made after the conspiracy ended are not admissible."); United States v. Fields, 871 F.2d 188, 197 (1st Cir. 1989) ("Evidence of a conspirator's post conspiracy activity is admissible if probative of the existence of a conspiracy or the participation of an alleged conspirator, 'even though they might have occurred after the conspiracy ended.'") (quoting Anderson v. United States, 417 U.S. 211, 219 (1974)).

Two of Mangual's checking accounts are at issue. The first checking account was opened in July of 2002, during the period of the charged conspiracy, and closed in September of 2003. The account reflected deposits totaling $177,456 and withdrawals totaling $177,189. The second account, which Mangual opened in

-29-

December of 2003, also indicated numerous withdrawals and deposits, each totaling approximately $98,000. Mangual ceased all activity with the second account on March 15, 2004, twelve days after his indictment was unsealed.

From 1996 through 2004, Mangual did not file income tax returns with the Puerto Rico Department of Treasury, yet his bank accounts reflected the movement of large amounts of money in short periods of time from July 2002 through March of 2004.[12] His financial activity, coupled with his failure to report his income, is indicative of an intent to conceal funds, which is relevant evidence in establishing the existence of, and Mangual's participation in, a money laundering conspiracy. See Upton, __ F.3d __, slip op. at 16 (holding that failure to file required tax return constituted evidence of concealment and an act in furtherance of money laundering conspiracy);[13] United States v. Hall, 434 F.3d 42, 52 (1st Cir. 2006) ("[C]ash is a frequent by-product of many kinds of illegal activity [and] converting cash into useable funds is [therefore] probative of money laundering.") (internal quotation marks and ellipsis omitted); United States v. Leon-Delfis, 203 F.3d 103, 114 (1st Cir. 2000) ("[E]vidence of

_____

[12]Mangual does not challenge the admission into evidence of his failure to file income tax reports.

[13]At least one member of this court believes that our holding in Upton is in tension with the Supreme Court's ruling in Grunewald v. United States, 353 U.S. 391 (1957). See Upton, __ F.3d __, slip op. at 28 (Lipez, J., dissenting).

-30-

possession or control over substantial sums of money from unexplained sources is relevant in criminal cases involving money."). That some of the bank account evidence reflected activity after December of 2002 does not render the evidence irrelevant. The indictment listed only an approximate end date of the conspiracy, which was "no[] earlier than in or about December 2002." Evidence of his bank account activity after this date, therefore, may still be considered within the scope of the charged conspiracy.

Mangual further argues, for the first time on appeal, that the bank account evidence was unfairly prejudicial. Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. "Evidence is unfairly prejudicial if it invites the jury to render a verdict on an improper emotional basis." United States v. Rodriguez, 525 F.3d 85, 98 (1st Cir. 2008) (internal quotation marks omitted). The bank account evidence was not unfairly prejudicial. The probative value of the evidence was significant because it indicated an intent to conceal funds in the context of a money laundering conspiracy. Further, the evidence was neither "shocking [n]or heinous" and was not of a nature which was likely to overwhelm the emotions of an ordinary juror. Id. (quoting United States v. Varoudakis, 233 F.3d 113, 122 (1st Cir. 2000)). Therefore, the bank account evidence was not admitted in violation

of Rule 403.  Because we find that there was no Rule 403 error, we need not engage in the plain error analysis.

C. <u>Continuance</u>

Mangual argues that the court erred in denying his request for a continuance, which he contends was necessary to give his new attorney adequate time to prepare for trial.  He asserts that the trial schedule deprived him of his right to a fair trial and the effective assistance of counsel.

The district court's denial of a requested continuance is reviewed for abuse of discretion, which is found only where "the Court exhibited an unreasonable and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay." <u>United States</u> v. <u>Rodriguez-Duran</u>, 507 F.3d 749, 762-63 (1st Cir. 2007).  However, the district court's discretion is "limited by the defendant['s] constitutional rights to effective assistance of counsel and to the testimony of defense witnesses." <u>United States</u> v. <u>Orlando-Figueroa</u>, 229 F.3d 33, 39-40 (1st Cir. 2000).  Among the factors we consider are: "the reasons contemporaneously presented in support of the request, the amount of time needed for effective preparation, the complexity of the case, the extent of inconvenience to others if a continuance is granted, and the likelihood of injustice or unfair prejudice attributable to the denial of a continuance." <u>Rodriguez-Duran</u>, 507 F.3d at 763.  "A defendant is generally not entitled to a new trial unless he or she

can identify specific ways in which the court's erroneous denial of a continuance prejudiced his or her defense."  <u>United States</u> v. <u>DeCologero</u>, 530 F.3d 36, 79 (1st Cir. 2008).

Mangual filed a pro se motion requesting the withdrawal of his court-appointed attorney on November 9, 2006, seven days before his trial was scheduled to begin.  The court reset the trial date, and held a hearing on Mangual's motion on November 27.  At the hearing, the court granted Mangual's request and granted a continuance until January 8, 2007.  The court gave Mangual until December 15, 2006, to hire new counsel.

Mangual's new counsel, Luis Rafael Rivera ("Rivera"), made his first appearance on December 15 and by motion filed that same day, counsel informed the court that he had a scheduled vacation from December 26, 2006, through January 8, 2007, and requested a continuance until February 15, 2007, in order to investigate the charges and prepare for trial.  The court did not respond until January 3, 2007, while Rivera was on vacation, when it summarily denied the requested continuance.

Mangual was not without fault for waiting to seek removal of his court-appointed counsel days before his trial was scheduled to begin in November.  Nor was his new counsel without fault for agreeing to represent Mangual for a trial scheduled in January when he was planning on leaving the country for vacation.  The trial court, however, never told Mangual or his counsel that no further

continuances would be granted. Once the court granted Mangual's request to remove his counsel and allowed him to hire new counsel, the court had an obligation to ensure that his counsel had adequate time to prepare for trial. The government argues that Mangual's new counsel had sufficient time to prepare because the evidence consisted of purely historical testimony and the case did not involve complex legal issues. The evidence, however, spanned more than eight years, involving numerous individuals and drug transactions. The testimony from government witnesses alone lasted for four days. Mangual's new counsel had only three and one half weeks to review the evidence and prepare for Mangual's trial. Moreover, the court was aware that counsel would be out of the country for the majority of this period when it accepted his appearance and summarily denied Mangual's request for a continuance, just five days before trial. The court offered no justification for its insistence on the January 8 trial date, which would have delayed the trial by a little over a month.

Under the circumstances of this case, therefore, it was an abuse of discretion for the trial court to deny Mangual's request for a continuance. Despite the court's error, however, Mangual is not entitled to a new trial because he has failed to show on appeal that his defense was prejudiced by the denial. See id.

Mangual argues generally that he and his counsel were not given enough time to prepare his defense. Specifically, he claims that a continuance would have given him time to produce evidence, such as receipts, showing that the deposits into his Western Bank accounts were not the proceeds of drug transactions, but were from legitimate sales by his company, Diesel Xpress, and from his earnings through cockfighting. Mangual also claims that with more time he could have found witnesses to testify that Antonio and Mangual were not friends, as Antonio claimed, and that Mangual was in Florida during the times that the government witnesses claimed he was in Puerto Rico.

Mangual had five months prior to trial, during which he was represented by court-appointed counsel, to obtain the evidence he contends would have been beneficial to his case. The Diesel Xpress receipts he now offers were from his own business, and he produced them to support a Rule 29 motion filed January 24, just eight days after the close of evidence. Mangual offers no explanation as to why the denial of a continuance prevented him from producing the receipts in time for trial. Mangual also fails to explain how the denial of the continuance prevented him from showing that part of his income came from gambling at cockfights. Moreover, evidence that Mangual gambled at cockfights was introduced at trial - through the testimony of several government witnesses. Mangual does not explain what further evidence he would

have introduced to support his defense, or why additional time would have allowed him to obtain more evidence.

Mangual next argues that a continuance would have allowed him to locate witnesses who could impeach Antonio's testimony that he and Mangual were friends. The absence of such testimony, however, did not prejudice his defense. Antonio's friendship with Mangual was not material to the case, and Mangual does not dispute Antonio's extensive testimony regarding the drug transactions between them. Further, counsel conducted an effective cross-examination of Antonio about his relationship with Mangual. Counsel established that Antonio and Mangual were never photographed, videotaped, or recorded together, and that Antonio never visited Mangual's home. Even without defense witnesses, therefore, Mangual was able to make his point before the jury.

Mangual also argues that a continuance would have allowed him to present witnesses to testify that he was in Florida during times that the government witnesses claimed he was in Puerto Rico. The three coconspirators never testified, however, as to specific dates that the drug transactions occurred; they spoke only in terms of years. It is highly unlikely, therefore, that any witness presented by Mangual would be able to contradict such broadly-defined time periods. Further, the indictment charged Mangual with conspiracy to possess and distribute narcotics in both Puerto Rico and Florida. Evidence that Mangual was occasionally in Florida

during the conspiracy period would have done little to support his defense.

Mangual has failed to show that the district court's denial of his request for a continuance caused him prejudice. In the absence of prejudice, a new trial is not warranted under the circumstances of this case.

D. Delay

Mangual argues that the 110-day delay in bringing him before a federal magistrate violated Federal Rule of Criminal Procedure 5(a) and that the district court erred in refusing to dismiss the indictment.[14] The government acknowledges the delay but argues that the purpose of Rule 5(a) is to prevent federal officials from using the delay to obtain a confession and that because no such tactics are alleged in this case, reversal of Mangual's conviction is not warranted.

Rule 5(a) requires that when an individual is arrested in the United States on a federal arrest warrant, he must be taken "without unnecessary delay before a magistrate judge." Fed. R. Crim. P. 5(a)(1)(A). "After a defendant has been tried and convicted, . . . delay in bringing him before a magistrate is not reason to set aside the conviction unless the defendant can show

_____

[14]Although the record is not clear, it appears that Mangual was in state custody during this time, facing state prosecution based on the items found during the 2006 search of his home in Florida. Mangual was sentenced for violation of state law on June 21, 2006, to time served.

that he was prejudiced by the delay." United States v. Causey, 835 F.2d 1527, 1529 (5th Cir. 1988); see United States v. Beltran, 761 F.2d 1, 8 (1st Cir. 1985).

Other circuits have held that such prejudice results only when the government uses the delay to subject the defendant to unwarranted interrogation. See, e.g., United States v. Cardenas, 410 F.3d 287, 293-94 (5th Cir. 2005); United States v. Garcia-Echaverria, 374 F.3d 440, 452-53 (6th Cir. 2004); United States v. Morrison, 153 F.3d 34, 56 (2d Cir. 1998); Theriault v. United States, 401 F.2d 79, 86 (8th Cir. 1968). In this circuit, we have not resolved whether other prejudice caused by an unreasonable delay would require setting aside a conviction. See United States v. Encarnacion, 239 F.3d 395, 400 n.5 (1st Cir. 2001). We need not delve into the prejudice issue in this case, however, because Mangual has not shown prejudice of any kind that was caused by the delay.

Mangual argues that the 110-day delay between his arrest in February of 2006 and his arraignment before a federal magistrate in June of 2006 prejudiced him because it caused him to lose that time to secure counsel and prepare for trial. The record, however, belies his claims of prejudice. Mangual retained counsel, who filed an appearance on Mangual's behalf in the federal case, on April 4, 2006. A month later counsel moved to withdraw at Mangual's request, representing that "[a]llowing this attorney to

-38-

withdraw from any further legal representation will cause no prejudice either to the United States of America or the defendant, nor will it delay the proceedings" and that Mangual "indicated to [this] attorney [that] he will retain a different attorney upon being transported to Puerto Rico." The motion was granted on June 26, 2006. Mangual was subsequently returned to Puerto Rico, made an initial appearance before the Puerto Rico district court on August 3, 2006, and counsel was appointed to represent him on August 7, 2006. At that time, trial was scheduled for November of 2006. This gave Mangual and his new counsel three months to prepare for trial.

Mangual offers no other claims of prejudice resulting from the delay. Therefore, he is not entitled to reversal of his conviction based on the delay between his arrest and his appearance before a federal magistrate.

## III.

For the foregoing reasons, Mangual's convictions are **<u>affirmed</u>**.