**Not for Publication in West's Federal Reporter**

# United States Court of Appeals
## For the First Circuit

No. 23-1948

UNITED STATES OF AMERICA,

Appellee,

v.

ADIANGEL PAREDES,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Barron, Chief Judge,
Howard and Montecalvo, Circuit Judges.

Jean C. LaRocque, with whom Shea and LaRocque, LLP, was on
brief, for appellant.

Mark T. Quinlivan, Assistant U.S. Attorney, with whom Leah B.
Foley, United States Attorney, was on brief, for appellee.

October 24, 2025

**MONTECALVO, Circuit Judge.** Defendant Adiangel Paredes appeals from his conviction following a jury trial, of one count of conspiracy to distribute and to possess with intent to distribute one kilogram or more of heroin, 400 grams or more of fentanyl, and 500 grams or more of cocaine in violation of 21 U.S.C. § 846. Paredes now argues that, at trial, (1) the district court erroneously permitted testimony about the meaning of various telephone calls and text messages admitted into evidence, and (2) the evidence presented varied from the allegations contained in the indictment. For the reasons that follow, we are not persuaded by either argument and, accordingly, affirm.

## I. Background

We recite the facts in "the light most favorable to the verdicts being appealed." United States v. Mangual-Santiago, 562 F.3d 411, 418 (1st Cir. 2009) (citing United States v. Sanchez-Badillo, 540 F.3d 24, 27 (1st Cir. 2008)). In September 2018, the Boston Strike Force of the Federal Bureau of Investigation ("FBI") began investigating an alleged drug trafficking organization ("DTO") operating in Fitchburg, Massachusetts. The FBI identified Anthony Baez and another individual who later became a confidential witness ("CW-6") as the leaders of the DTO. FBI agents worked with two other confidential witnesses to arrange drug purchases (referred to as "controlled

purchases") from Baez and CW-6, purchasing increasingly larger amounts of drugs.

During the investigation, the FBI obtained wiretaps on telephones belonging to several individuals involved in the DTO, namely, Baez, Pablo Vidarte Hernandez, CW-6, and Paredes. The FBI identified Paredes after intercepting a telephone call between Baez and Vidarte. During that telephone call, Baez asked for the price of cocaine, and, after hanging up, Vidarte immediately called a telephone number later connected to Paredes. Following that call, Vidarte immediately called Baez back and relayed the requested prices.

Over the course of their investigation -- through telephone calls and text messages between Paredes, confidential witnesses, and other members of the DTO -- FBI agents connected Paredes to several drug sales, including sales of cocaine, heroin, and fentanyl. As a general matter, the heroin[1] transactions that the FBI identified followed a pattern: (1) CW-6 would call Vidarte to order drugs, (2) Vidarte would call Paredes to arrange for Paredes to deliver the drugs to Vidarte, and (3) Vidarte would call CW-6 to confirm the pick-up arrangements.

---

[1] While confidential witnesses arranged to purchase heroin from the DTO, laboratory tests revealed that the purchased substances contained a mixture of heroin and fentanyl.

During the same time, a different confidential witness, CW-5, also purchased heroin and fentanyl from the DTO through Paredes, which he would later resell. CW-5 sold large amounts of cocaine, at least 100 grams every one to three weeks, to Paredes. These cocaine sales are at the core of Paredes's appeal. In addition, the telephone call described earlier, which the FBI used to identify Paredes as a member of the DTO, reveals that Baez purchased cocaine supplied by Paredes on at least one occasion. However, the record does not reveal from whom Paredes obtained the cocaine.

In 2020, a federal grand jury returned a superseding indictment against Paredes and other individuals involved in the DTO. Paredes was charged with conspiracy to distribute and to possess with the intent to distribute heroin, cocaine, and fentanyl[2] in violation of 21 U.S.C. §§ 841(a)(1), 846.[3] The indictment further alleged that the offense charged involved "400 grams or more of a mixture and substance containing a detectable amount of" fentanyl and "100 grams or more of a mixture and

[2] The indictment also listed cocaine base as one of the charged substances. However, the jury instructions did not reference cocaine base because the government had informed the court that "there was no evidence that Paredes was involved in the distribution of cocaine base." And rather than listing the specific drugs involved, the jury verdict form simply listed "controlled substances."

[3] The eight-count indictment charged Paredes along with seventeen others, including Baez and Vidarte.

- 4 -

substance containing a detectable amount of heroin." Additionally, the indictment alleged that both substances were "reasonably foreseeable by" and "attributable to" Paredes such that statutory mandatory-minimum sentences applied to the charge, § 841(b)(1)(A)(vi) (ten-year mandatory minimum for substance containing fentanyl), (b)(1)(B)(i) (five-year mandatory minimum for substance containing heroin).

The case proceeded to trial, during which the government elicited testimony from two FBI agents involved in the investigation, CW-5, and several of the confidential witnesses who participated in controlled purchases. The government also presented transcripts of numerous telephone calls and text messages between members of the DTO, including Paredes, and between DTO members and confidential witnesses. With respect to these calls and messages, the government asked the FBI agents multiple questions about what they understood those messages to mean (e.g., asking the agents what they understood certain slang terms to mean or what they understood certain comments to be referring to).

Following the seven-day trial, the jury convicted Paredes of the one count of conspiracy to distribute and to possess with intent to distribute 1 kilogram or more of heroin, 400 grams or more of fentanyl, and 500 grams or more of cocaine in violation of 21 U.S.C. § 846. The jury additionally found that the conspiracy involved 400 grams or more of "a mixture or substance

- 5 -

containing a detectable amount of" fentanyl and 100 grams or more of "a mixture or substance containing a detectable amount of" heroin and that both were "reasonably foreseeable by" or "attributable to" Paredes. Other details from the trial which are relevant to the issues on appeal are discussed below.

The district court sentenced Paredes to 135 months of incarceration to be followed by 5 years of supervised release. Paredes timely appealed his conviction.

## II. Discussion

On appeal, Paredes raises two claims of error: (1) that the district court erred in allowing the FBI agents to testify as to their understanding of various telephone calls and text messages, and (2) that the evidence presented at trial varied from the charges presented in the indictment. Neither is availing.

## A. Evidentiary Issue

Paredes first argues that the district court erred in permitting law enforcement officers to explain what they understood various statements made in the wiretapped telephone calls and texts to mean. Paredes notes that there were several colloquies between the government and the officers where a portion of a text message or telephone call transcript was read aloud and, when asked by the government, the officers "interpret[ed] what [they] believed the parties were discussing." Paredes asserts that such interpretation was not needed because the language in

these intercepted communications was "clear" and did not contain "ambiguous terms or cryptic statements." Paredes contends that "[t]he district court erroneously permitted law enforcement witnesses to testify as to what their interpretation was of wiretapped phone calls and text messages," going "beyond permissible opinion testimony regarding industry trade and customary use." Notably, although the government introduced many calls and messages and asked the officers many questions about them, Paredes has not included the specific testimony he takes issue with nor explained why that testimony is problematic. Instead, he relies on broadly stated legal principles and only a handful of citations to discrete portions of testimony -- he makes no arguments about why the particular testimony went "beyond permissible opinion testimony." In response, the government contends that the claim is "triply waived." We agree that Paredes has waived this issue.

### 1. Additional Background

Prior to trial, the government filed a motion in limine regarding "the admissibility of law enforcement lay opinion testimony" about, among other things, "coded language of drug dealers." Paredes filed his own motion in limine, asking the district court to "prohibit any [g]overnment witness from commenting on, or testifying as to, their interpretation of the recordings and texts being offered by the [g]overnment in this

case."  The district court reserved judgment on these issues until they arose at trial, explaining during a pretrial conference that it would "deal with these [issues] individually . . . let [the parties] refine [their] arguments at the time."

At trial, the government called Bradley John Gullicksrud, an FBI supervisory special agent involved in the investigation of the DTO.  During his testimony, the government read into evidence a translated transcript of a telephone call (originally in Spanish) between Paredes and Vidarte.  Before the government began questioning Gullicksrud about the contents of the call, Paredes's counsel objected.

Paredes's counsel explained that the objection related to the motion in limine and that he objected "to any interpretation by the officer as to what this actually means."  The court then inquired of the government, asking "what exactly" Gullicksrud would be asked to interpret, noting that it thought "the call pretty much speaks for itself."  The government explained that it would inquire as to the meaning of various terms used in the telephone call transcripts and text messages it planned to introduce.  There was then a brief discussion between the parties about which terms would be asked about and how the government witness would explain them, at which point Paredes's counsel determined that the government was not seeking to elicit testimony that Paredes would object to.  The exact exchange follows:

[Paredes's counsel]: In this case they're interpreting it in a way I don't object to but . . . if there's no interpretation the other way, I don't . . . I don't have the same objection.

THE COURT: So it sounds to me like there's not an issue on that.

[Paredes's counsel]: Apparently there's not going to be, and I just wanted to put that out there because that goes in two different . . . directions.

THE COURT: Okay. Okay.

[Paredes's counsel]: Thank you, your Honor.

[Government]: I don't believe . . . that's going to be an issue, your Honor.

The government then proceeded with its questioning of Gullicksrud regarding the call transcript and introduced additional calls and texts, similarly asking Gullicksrud to explain his understanding of those calls. Paredes's counsel did not object to any of the questions or to any of Gullicksrud's testimony regarding his understanding of what the various communications meant.

The government later called Michael Rumery, a sergeant with the Massachusetts Department of Corrections, who was also assigned as a task force officer with the Department of Justice's Organized Crime Drug Enforcement Task Force in Boston. Rumery worked alongside Gullicksrud on the FBI's investigation of the DTO. Again, the government presented telephone call transcripts and text messages and asked Rumery to explain what he understood

the communications "to be talking about" and certain terms to mean. At no point did Paredes's counsel object to such questioning.

## 2. Analysis

We agree with the government that Paredes's challenges to Gullicksrud and Rumery's testimony regarding their understanding of the various texts and telephone calls admitted during trial have been waived, for several reasons.

First, although Paredes objected when the government first sought to introduce the allegedly offending evidence, he ultimately withdrew that objection. His counsel explained that "I don't have the same objection" and "[a]pparently there's not going to be" an issue with the evidence. While the nature of this withdrawal suggested the possibility of future objections, Paredes's counsel did not object to later questioning that elicited this type of "interpretation" testimony. Thus, Paredes has waived his claim of error. See United States v. Miranda-Carmona, 999 F.3d 762, 767 (1st Cir. 2021) ("[A] party cannot concede an issue in the district court and later, on appeal, attempt to repudiate that concession and resurrect the issue." (quoting United States v. Rivera-Ruperto, 846 F.3d 417, 431 n.10 (1st Cir. 2017))).

Further, while Paredes suggests that his motion in limine preserved his evidentiary challenges, "when the district court tentatively denies a pretrial motion in limine, or temporizes on it, the party objecting to the preliminary in limine

determination must renew his objection during the trial, and the failure to do so forfeits any objection." United States v. Noah, 130 F.3d 490, 496 (1st Cir. 1997).  Here, the district court made clear that the issue raised in the motion in limine would be addressed with respect to specific testimony as it occurred during trial.  The district court's assessment established that it would not make a single, general determination and that Paredes would need to contemporaneously object to each allegedly problematic piece of testimony.  Thus, we do not agree that Paredes's motion in limine preserved his challenges to this evidence.

Second, any of the evidence admitted without objection, if such objection was merely forfeited, would be reviewed for plain error, see United States v. Concepcion-Guliam, 62 F.4th 26, 32 (1st Cir. 2023), but Paredes has not addressed, let alone analyzed, the plain error standard.  Accordingly, claims relating to that evidence are waived.  See United States v. Pérez-Greaux, 83 F.4th 1, 31 (1st Cir. 2023).

Third, and finally, Paredes has failed to provide sufficient citations to the portions of the record regarding the evidence he now challenges and, more importantly, has provided only bare-bones analysis as to why such evidence was inadmissible. He has not, for example, explained how any specific agent testimony went beyond acceptable opinion evidence.  Accordingly, we deem his claims waived for insufficient briefing.  See United States v.

- 11 -

Martínez-Hernandez, 118 F.4th 72, 97-98 (1st Cir. 2024) ("It is [an appellant's] responsibility to specify the statements to which [the appellant] objects. That particularity is important not only so that we may assess the claim of error, but also so that we may determine whether any error detected was harmless." (citation and footnote omitted)); see id. at 98 ("[B]ecause [appellant] has failed to 'put flesh on [the] bones' of his hearsay argument -- effectively asking 'the court to do counsel's work' -- we view this claim as waived for lack of 'developed argumentation.'" (third alteration in original) (quoting United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990))). Thus, for multiple reasons, Paredes has waived review of this evidentiary claim.

## B. Indictment Variance

Next, Paredes argues there was insufficient evidence to support the jury's verdict because the evidence presented at trial "[v]aried [m]aterially" from the charges contained in the indictment. Specifically, he contends that, although the indictment charged a single conspiracy, the evidence at trial revealed multiple different conspiracies -- the heroin and fentanyl conspiracy with the DTO and a separate and distinct cocaine conspiracy between Paredes and CW-5 -- meaning that the government had failed to prove Paredes was involved in the charged single conspiracy involving fentanyl, heroin, and cocaine. He

contends that the evidence showed that his cocaine dealings with CW-5 were not connected to the DTO, and that the government had not shown "that CW-5 and Paredes knew and agreed to some scheme larger than their own spoke."

In response, the government argues that the evidence supports the conclusion that dealings between CW-5 and Paredes were part of the larger DTO conspiracy and, even assuming there was a variance, it did not prejudice Paredes. We agree that Paredes has not established that any variance prejudiced him and, accordingly, he cannot succeed on this claim.

"A variance occurs when the crime charged remains unaltered, but the evidence adduced at trial proves different facts than those alleged in the indictment." Mangual-Santiago, 562 F.3d at 421 (quoting United States v. Yelaun, 541 F.3d 415, 419 (1st Cir. 2008)). We review preserved variance arguments de novo. United States v. Walker-Couvertier, 860 F.3d 1, 14 (1st Cir. 2017). In determining whether the evidence presented at trial varied from the crime charged, "we 'review the record to determine whether the evidence and reasonable inferences therefrom, taken as a whole and in the light most favorable to the prosecution, would allow a rational jury to determine beyond a reasonable doubt' that a single conspiracy existed." Mangual-Santiago, 562 F.3d at 421 (quoting United States v. Mena-Robles, 4 F.3d 1026, 1031 (1st Cir. 1993)). "The jury's finding, however, need not be inevitable." Id.

- 13 -

(citing United States v. Boylan, 898 F.2d 230, 243 (1st Cir. 1990)).

In situations such as this, our assessment must be "pragmatic," and "[w]e consider, among other things, whether a rational jury could have found that the coconspirators had a common goal, were interdependent, and had overlapping roles." Walker-Couvertier, 860 F.3d at 14 (citing United States v. Fenton, 367 F.3d 14, 19 (1st Cir. 2004)). Importantly, "[a] variance is grounds for reversal only if it is prejudicial, that is, if it affects the defendant's 'substantial rights.'" Id. at 16 (alteration in original) (quoting Mangual-Santiago, 562 F.3d at 421).

Paredes contends that, instead of presenting evidence of a single conspiracy, the government presented evidence of two separate conspiracies: the DTO, of which Paredes was a part, and the cocaine dealings between Paredes and CW-5.[4] He has not,

_____

[4] Before trial, Paredes moved to exclude CW-5's testimony as irrelevant, arguing that it was prior conduct being introduced as propensity evidence to show that because Paredes was involved in prior drug deals, he must be part of the DTO. The government contended that CW-5 would testify to deals that occurred during the relevant time and that CW-5 "was an unindicted coconspirator" and that "his testimony [wa]s entirely within the scope of admissibility." On appeal, Paredes again argues that all of CW-5's testimony was irrelevant. However, aside from asserting that "the evidence did not even suggest CW-5 was involved in any conspiracy involving the . . . DTO" and therefore is irrelevant, Paredes has not provided any argumentation on that point. Indeed, this point is buried within the portion of the brief dedicated to his variance

- 14 -

however, sufficiently argued why such a variance prejudiced him and so has waived any variance argument.  See id. (finding failure "to offer any developed argumentation" on the "keystone issue" of prejudice rendered variance claim waived (first citing Zannino, 895 F.2d at 17 and then quoting Mangual-Santiago, 562 F.3d at 421)).

Even assuming no such waiver, we cannot see how any variance could have prejudiced Paredes.  We have explained three ways in which a variance can prejudice a defendant:

> First, a defendant may receive inadequate notice of the charge against him and thus be taken by surprise at trial.  Second, a defendant may be twice subject to prosecution for the same offense.  Third, a defendant may be prejudiced by 'evidentiary spillover': the 'transference of guilt' to a defendant involved in one conspiracy from evidence incriminating defendants in another conspiracy in which the particular defendant was not involved.

United States v. Wihbey, 75 F.3d 761, 774 (1st Cir. 1996) (citations omitted) (citing United States v. Sutherland, 929 F.2d 765, 772-73 (1st Cir. 1991)).  In his bare-bones reference to prejudice, Paredes identifies only evidentiary spillover as a basis for prejudice.

---

claim.  Thus, we deem any claim of error regarding the relevance of CW-5's testimony waived.  United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

However, it is well established that, "when the evidence shows that the defendant was involved in criminal activities that constituted separate conspiracies, no prejudice arises because the defendant, himself, engaged in charged conduct attributable to each conspiracy." Mangual-Santiago, 562 F.3d at 423 (citing United States v. Dunbar, 553 F.3d 48, 62 (1st Cir. 2009)). "Put another way, multiple conspiracy is not a defense unless it creates reasonable doubt about whether the defendant is guilty of the charged conspiracy." Id. (quoting Dunbar, 553 F.3d at 62).

Here, Paredes does not dispute that he was part of both conspiracies, and given his inadequate briefing on the subject, he does not address how his case requires divergence from our general rule that such circumstances are not prejudicial.

### III. Conclusion

For these reasons, we **affirm** Paredes's conviction.