# United States Court of Appeals
## For the First Circuit

No. 10-1775

UNITED STATES OF AMERICA,

Appellee,

v.

JOSE ROMERO-LOPEZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Boudin, Selya and Dyk,*
Circuit Judges.

Jorge Luis Armenteros-Chervoni, for appellant.
Maritza González-Rivera, Assistant United States Attorney,
with whom Rosa Emilia Rodriguez-Velez, United States Attorney,
Nelson Pérez-Sosa, Assistant United States Attorney, and Thomas F.
Klumper, Assistant United States Attorney, were on brief, for
appellee.

September 17, 2012

---

*Of the Federal Circuit, sitting by designation.

**DYK**, **Circuit Judge**.  Defendant-Appellant José Romero-López ("Romero") was convicted after jury trial of money laundering offenses in violation of 18 U.S.C. §§ 1956 and 982.  On appeal, Romero contends that he is entitled to a new trial based on errors committed by the district court.  Romero asserts that his due process rights were violated when the district court advanced the scheduled trial date by one day and that the district court erred in allowing the prosecution to present evidence relating to his tax returns and his activities and detention by federal authorities when traveling through the San Diego airport.  We find no merit to Romero's contentions, and affirm his conviction.

## I.

On September 16, 2009, in the United States District Court for the District of Puerto Rico, Romero was charged by a grand jury in a forty-one count criminal indictment.  The indictment charged one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h), thirty-nine counts of money laundering in violation of 18 U.S.C. §§ 1956(a) and 2, and one count of money laundering forfeiture under 18 U.S.C. § 982.  The indictment alleged that beginning in or about 2000 through about 2005, Romero had engaged in various activities designed to conceal the proceeds of unlawful drug activity totaling approximately $1.4 million.  Romero pleaded not guilty to all

counts, and the district court scheduled trial for November 23, 2009.

Five days before the scheduled trial date, the district court advised the parties that due to a scheduling conflict, trial would be "placed on the trial-ready calendar" and notified the parties that "[t]he parties and counsel shall be ready to try this case with 24-hours notice on or before January 20, 2010." Order, United States v. Romero-Lopez, No. 09-304 (D.P.R. Nov. 18, 2009), ECF No. 24. In response to scheduling concerns voiced by defense counsel,[1] the court subsequently set a firm trial date of December 15, 2009. On December 1, 2009, the district court advanced the trial date by one day to December 14, 2009. On December 9, 2009, defense counsel filed a motion to continue trial to March 2010, which was denied by the district court on the day it was filed. The following day, defense counsel filed a motion to reinstate the previously scheduled trial date of December 15, 2009, contending that "changing the date of trial without prior notice, particularly if it cuts days for preparation, [is] a violation of due process." Motion to Reinstate Trial Original Scheduling at 2, United States v. Romero-Lopez, No. 09-304 (D.P.R. Dec. 10, 2009), ECF No. 33.

---

[1] Defense counsel advised the district court that he might have a potential scheduling conflict because he had two federal criminal trials scheduled for December 7 and 8, 2009, a federal civil trial scheduled for January 4, 2010, and an additional state criminal trial that might also conflict with the court's "trial-ready" order. Accordingly, counsel requested that the court set a firm trial date.

Defense counsel also noted in the motion that he had a child custody hearing scheduled for December 19, 2009. Id. This motion was also denied.

As scheduled, a jury trial commenced on December 14, 2009. However, during the course of the trial, on defense counsel's motion, the court continued trial from December 18 to December 21, 2009, due to "severe health problems" faced by defense counsel.

During trial, the government presented evidence that Romero, along with his business partner, Miguel Reyes, also known as "Chino," operated two businesses--one a legitimate sandwich shop and the other an illegal money-laundering scheme designed to conceal the proceeds of illegal drug activity. The government presented the testimony of several witnesses to establish that Romero and Chino sent money by wire transfer to San Diego, California to pay for marijuana. The government also established that after Chino was murdered in 2003, Romero continued to wire transfer money to San Diego. The government's theory was that Romero used his legitimate sandwich shop business to accomplish his money-laundering scheme by having his sandwich shop employees wire transfer funds to San Diego on his behalf after Chino's death. The period of the alleged conspiracy and illegal activity was from 2000 to 2005, including both the period when Romero sent wire transfers

at Chino's behest and the period when Romero transferred money after Chino's death.

Among the government's witnesses were two former employees of Romero's sandwich shop business, Miguel Rosa-Muriel ("Rosa") and Luís Díaz-Berríos ("Díaz"),who testified that Romero had directed them to wire transfer money to San Diego. According to Rosa and Díaz, following Chino's death, Romero directed them to transfer a total of $60,500 and $79,500, respectively. The government, through the testimony of an official from the Treasury Department of Puerto Rico, also introduced Romero's tax returns for 2001 through 2004, which showed the income that he reported in those years from his sandwich shop business. The government argued that the limited revenues for the sandwich shop business shown on the returns were insufficient to explain the wire transfers.

Romero was the sole witness for the defense. He testified that Chino gave him money and directed him to wire transfer it to San Diego, but that Chino never told him the purpose behind the wire transfers or what type of business Chino had in San Diego. As to the wire transfers made after Chino's death in 2003, Romero testified that following Chino's death, Chino's cousin Alexis came to him and told him that he had to continue sending money, and gave him the money to send. In short, the defense's theory was that Romero had no knowledge that the transfers were made to conceal illegal activity and that he was merely performing

a favor for his friend and business partner, Chino (and later Alexis).

On cross-examination, the government inquired about the income that Romero reported on his tax returns for 2000 through 2004, which showed net incomes of only $2,216, $7,206, $4,147, negative $7,642, and $35,069, in 2000, 2001, 2002, 2003, and 2004, respectively. The government then asked Romero about the money that he wire transferred to San Diego, as well as the money that Rosa and Díaz had sent to San Diego on Romero's behalf. The government's theory apparently was that although Romero was sending large sums of money to San Diego, he reported only minimal income from his legitimate business, implying that the money that was sent to San Diego was derived from his illegitimate business. Following this line of questioning, the government then questioned Romero about a 2005 trip that he took with his wife to San Diego in which he was detained while carrying six money orders and $4,000 in cash. The government elicited that the money was seized by federal agents, and that Romero never attempted to claim the money after his release.

On December 22, 2009, the jury returned a verdict finding Romero guilty of all counts, and finding that $257,000 should be forfeited by Romero. Romero was sentenced to one hundred thirty-five months of imprisonment and ordered to forfeit $257,000 as

proceeds derived from the offenses for which he was convicted. Romero timely appealed.

## II.

On appeal, Romero does not challenge the sufficiency of the evidence to support his conviction. He argues only that he is entitled to a new trial due to three errors committed by the district court. Specifically, he alleges that the district court erred by (1) advancing the scheduled trial date by one calendar day, (2) admitting evidence of his tax returns for 2001 to 2004, and (3) allowing the government to question him regarding his 2005 trip to San Diego. We address each of Romero's claims in turn.

## A.

Romero contends that his due process rights were violated when the district court advanced the scheduled trial date by one day from December 15 to December 14, 2009. Romero argues that he was prejudiced because his counsel had a custody hearing scheduled for December 14, 2009 (though as we discuss below, this date is not reflected in the record), and his counsel's trial preparation was therefore disrupted due to the stress involved in the scheduling conflict and the need to resolve it. We review the district court's trial management decisions for abuse of discretion, as "[i]t is the province of the district court to manage its docket, and, within that province, to decide what constitutes a reasonable

-7-

period of time for preparation." United States v. Ottens, 74 F.3d 357, 359 (1st Cir. 1996) (internal citation omitted); see also United States v. Williams, 630 F.3d 44, 48 (1st Cir. 2010) (reviewing the district court's denial of a continuance for abuse of discretion). An abuse of discretion is "found only where the Court exhibited an unreasonable and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay. However, the district court's discretion is limited by the defendant['s] constitutional rights to effective assistance of counsel and to the testimony of defense witnesses." United States v. Manqual-Santiago, 562 F.3d 411, 429-30 (1st Cir. 2009) (alteration in original) (internal quotation marks and citation omitted).

Although "[n]ormally, one would expect a district court judge to grant a continuance of a trial in order to avoid an inadvertent scheduling conflict," United States v. Flecha-Maldonado, 373 F.3d 170, 175 (1st Cir. 2004), we conclude that the district court did not abuse its discretion in advancing trial by one day. Trial had been originally scheduled to commence on November 23, 2009. From the time of the district court's November 18 "trial-ready" order, defense counsel was fully aware that the case could proceed to trial at any moment and should have prepared accordingly. It was not until December 10, four days before the December 14 trial date, that defense counsel informed the court of

his conflicting custody hearing, which counsel asserted was scheduled for December 19, and not December 14, as Romero now claims on appeal.[2] Thus rescheduling trial to begin on December 15, rather than on December 14 would not have alleviated counsel's purported scheduling conflict.

Furthermore, counsel has pointed to no way in which an additional twenty-four hours of preparation would have made a significant difference. Counsel appeared for the first day of trial and actively participated. The fact that counsel was apparently disciplined for failing to appear at the state court child custody hearing on that same date has no bearing on the propriety of the district court's scheduling order. As we have previously noted, "[a] defendant is generally not entitled to a new trial unless he or she can identify specific ways in which the court's erroneous denial of a continuance prejudiced his or her defense." Mangual-Santiago, 562 F.3d at 430. We find no error in the district court's decision to advance the trial date by one day.

**B.**

We turn now to the two evidentiary issues. As with the district court's scheduling decision, we review the district court's evidentiary decisions for abuse of discretion. United

---

[2] At oral argument, defense counsel contended that he informally advised the district court that the scheduled date for the child custody hearing was in fact December 14. See Oral Arg. at 0:45. However, counsel provided no record evidence to support this contention.

States v. Hall, 434 F.3d 42, 56 (1st Cir. 2006). Romero argues that the district court impermissibly admitted (1) evidence as to his tax returns and (2) testimony regarding his trip to San Diego and detention by federal authorities as prior bad acts, which are prohibited to prove character by Federal Rule of Evidence 404(b).[3]

Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Nonetheless, such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan,

---

[3] Romero also contends that the government failed to comply with the district court's scheduling order by not "provid[ing] reasonable notice in advance of trial of any Rule 404(b) evidence." Scheduling Order at 3, United States v. Romero-Lopez, No. 09-304 (D.P.R. Sept. 23, 2009), ECF No. 9; see also Fed. R. Evid. 404(b)(2)(A) ("On request by a defendant in a criminal case, the prosecutor must . . . provide reasonable notice of the general nature of any such [404(b)] evidence that the prosecutor intends to offer at trial."). Romero failed to raise this issue before the district court, so we review it for plain error. See United States v. Sanchez-Berrios, 424 F.3d 65, 73 (1st Cir. 2005).
    In any event, we see no error, plain or otherwise. The government filed a notice of intent to use Romero's tax returns well in advance of trial and, as discussed below, evidence concerning Romero's trip to San Diego was used to refute Romero's testimony that he lacked knowledge of the purpose of the charged money laundering scheme. In other words, the San Diego trip was introduced to establish an element (knowledge) of the charged offense. "Rule 404(b) applies just to evidence of other bad acts or crimes--those other than the crime charged. Where evidence of 'bad acts' is direct proof of the crime charged, Rule 404(b) is, of course, inapplicable." Mangual-Santiago, 562 F.3d at 425.

-10-

knowledge, identity, absence of mistake, or lack of accident."

Fed. R. Evid. 404(b)(2). This court has previously explained that

> The admissibility of "other acts" evidence depends on a two-part analysis. First, "other acts" evidence must be excluded if "it is relevant only because it shows bad character (i.e., the proposed logical inference includes character as a necessary link)." Second, the district court must weigh the probative value of the "other acts" evidence against any unfair prejudice to the defendant; and it is only when the risk of unfair prejudice "substantially" outweighs its probative value that the evidence is to be excluded.

United States v. Shenker, 933 F.2d 61, 63 (1st Cir. 1991) (citations omitted). We first address whether admission of the tax returns was impermissible under Rule 404(b).

Romero asserts that the government offered his tax returns in order to show that he had failed to comply with reporting requirements required by the Treasury Department of Puerto Rico. However, the record is clear that the government's reliance on Romero's tax records for years corresponding to those in which the conspiracy took place was primarily to establish, not that he failed to report income on his tax returns, but rather that the money that he was sending to San Diego was not money derived from his legitimate sandwich shop business, but instead was the proceeds of illegal activity.[4] In responding to defense counsel's

---

[4] The one exception to this occurred when the government cross-examined Romero on whether he reported money that he admittedly received from Chino for making the wire transfers ($100 per transfer for a total of $5,100 over a five year period). See Transcript of Trial at 59-64, United States v. Romero-Lopez, No. 09-304 (D.P.R. Dec. 21, 2009), ECF No. 107. Defense counsel

objection to the admission of the tax returns, the government

explained:

> Your Honor, [the tax returns] go[] to the elements of the offense in the sense that he is charged with using drug money proceeds to promote and to further drug trafficking violations. And that is why -- that is the source -- We are going to the source of the funds. And, of course, what he reports as income is inextricably intertwined what [sic] he is sending, it is part and parcel. He's saying that this is his income, and the version that we heard is that it was for family members, so, of course, we have to show that there was an unexplained wealth.

Transcript of Trial at 18, United States v. Romero-Lopez, No. 09-304 (D.P.R. Dec. 16, 2009), ECF No. 106. Furthermore, during closing arguments, the government argued to the jury, "[w]hen you look at the totals in the tax returns and you look at the totals of

---

objected to this line of questioning on relevance grounds, but was overruled by the district court.

As a general rule, failure to report income on tax returns is relevant evidence in a money laundering conspiracy case, see, e.g., Mangual-Santiago, 562 F.3d at 429. While it is debatable whether the facts of this case fit the general rule, any possible error in admitting this line of questioning was patently harmless, especially given Romero's testimony that he did report the income on his tax returns, see United States v. Williams, 985 F.2d 634, 638 (1st Cir. 1993) ("Having reviewed the entire record and considered the probable impact of the error on the minds of the jurors, we conclude with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the [jurors'] judgment was not substantially swayed by the error." (alteration in original) (internal quotation marks omitted)). The government's line of questioning certainly does not rise to the level of reversible prosecutorial misconduct. See United States v. Gentles, 619 F.3d 75, 81 (1st Cir. 2010) ("[M]isconduct alone is insufficient to reverse a conviction absent a showing of prejudice. To determine if prejudice resulted, 'the test is whether the prosecutor's misconduct so poisoned the well that the trial's outcome was likely affected, thus warranting a new trial.'" (citation omitted) (quoting United States v. Azubike, 504 F.3d 30, 39 (1st Cir. 2007))).

-12-

the wire transfer, you will see that it is thousands and thousands of dollars in cash that were sent to San Diego over and over. . . . What was the source of this wealth that was being sent to San Diego?  I submit to you that the evidence has shown that the source was marijuana."  Transcript of Trial at 28, <u>United States</u> v. <u>Romero-Lopez</u>, No. 09-304 (D.P.R. Dec. 22, 2009), ECF No. 115.

Thus, the government's reliance on the tax returns was not designed to demonstrate Romero's character, but rather to establish an element of the money laundering offense--that the concealed proceeds were derived from illegal activity.[5]  To be sure, the defendant's testimony was that the money transferred was from Chino and Alexis, and there was no testimony that this money was sandwich shop revenue.  But the government was entitled to refute any possible argument that the wired funds were sandwich shop revenue.  <u>See</u> <u>United States</u> v. <u>Evans</u>, 697 F.2d 240, 248 n.8 (8th Cir. 1983) (noting that it was not error for the court to admit Rule 404(b) evidence in its case in chief where the evidence was tendered to rebut an anticipated defense).  Because the tax

---

[5]  <u>See</u> <u>Mangual-Santiago</u>, 562 F.3d at 428 (noting that the elements of conspiracy to commit money laundering are that the defendant agreed with another to "1) knowingly conduct a financial transaction 2) involving funds that [the defendant] knew to be <u>the proceeds of some form of unlawful activity</u> and 3) that were in fact <u>the proceeds of a 'specified unlawful activity,'</u> and 4) that [the defendant] knew the transactions to be designed in whole or in part to <u>conceal or disguise</u> the nature, location, source, ownership, or control of the proceeds of such unlawful activity." (alterations in original) (first and second emphases added)).

-13-

returns were admitted for "another purpose," they were not subject to automatic exclusion under Rule 404(b). Furthermore, we find that the potential probative value of the tax returns substantially outweighs the risk of unfair prejudice to the defendant. Thus, the district court committed no abuse of discretion in allowing admission of Romero's tax returns for the years in which the conspiracy was alleged to have taken place.[6]

## C.

Romero also urges that the district court erred by allowing the government to question him as to his 2005 trip and detention by federal authorities in San Diego. In particular, Romero argues that if the government wished to tie this incident to the conspiracy, it should have brought evidence as to this incident during the government's case-in-chief, rather than bring the incident up solely during its cross-examination of Romero. Reviewing the record as a whole, it is apparent that one of the principal purposes of the government's line of questioning was to refute Romero's contention that he had no knowledge of why Chino

---

[6] Romero also seems to contend that the government failed to establish how much gross income (rather than net income) he earned during the time period in question, i.e., Romero argues that the money that was being transferred could be accounted for by looking to the gross income reported on the tax returns. However, this argument goes to the weight, rather than the admissibility of the tax records. Indeed, Romero's counsel cross-examined the government's witness from the Treasury Department on this very point.

had asked him to transfer money to San Diego or that the money was the proceeds of illegal activity.

During Romero's testimony on direct examination, his counsel asked him about his knowledge of the money laundering conspiracy:

Q  And when, in fact, did you realize what was going on with Chino and Alexis?

A  When I was accused of this in this mess. . . .

Q  . . . Now, sir, when, if at any time, did Chino tell you about what business he had in California?

A  No, he never gave me an explanation.

Q  And why did you keep on sending these money orders?

A  Because he asked me to.  And my understanding was when I went to Western Union that there was nothing illegal involved in that.

Transcript of Trial at 32-33, United States v. Romero-Lopez, No. 09-304 (D.P.R. Dec. 21, 2009), ECF No. 107.  On cross-examination, Romero also testified that he did not know the people to whom he sent the wire transfers.  See id. at 48-49.

In order to rebut this testimony, the government inquired about his trip to San Diego in 2005, which was within the time period of the conspiracy.  The fact that Romero traveled to San Diego (the same city where he had wire transferred funds), during the time period of the alleged conspiracy, with a large sum of cash and money orders, was certainly relevant to refute his lack of knowledge.  In response to defense counsel's objection under Rule

404(b), the government explained, "He was detained with money and wire transfers [sic]. He just said that he didn't -- he didn't know what the money was coming from and didn't know who these people were. . . . I think it's within the scope of the conspiracy -- He took the stand, and he can be cross-examined about his knowledge." Id. at 53.

Furthermore, as the government pointed out in its closing, the jury could draw a reasonable inference that Romero failed to claim this money once he was released "because if he claimed it, he had to prove that it was legal . . . [and] he let it go because it was no savings. It was drug money proceeds." Transcript of Trial at 40, Romero-Lopez, No. 09-304, ECF No. 115. Although the fact that Romero had been detained by federal authorities (who also confiscated his money) during this trip may give rise to an inference of bad character within the meaning of Rule 404(b), that suggestion does not outweigh the probative value of this testimony as to the issue of Romero's knowledge that the funds he transferred were derived from illegal activity. See Fed. R. Evid. 404(b)(2) (evidence of other acts admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident" (emphasis added)). We find no abuse of discretion in the district court's decision to allow questioning on this incident.

## III.

For the foregoing reasons, we discern no error in the district court's scheduling or evidentiary rulings. Accordingly, Romero's conviction is affirmed.

**Affirmed**.